**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Larry Fate FORTUNE and Wayne**
**William Barfield,**
**Defendants-Appellants.**

No. 74–3125.

United States Court of Appeals,
Fifth Circuit.

May 30, 1975.

Rehearing and Rehearing En Banc
Denied Aug. 18, 1975.

Ardon E. Moore, Jr., Tyler, Tex. (Court-appointed), for Fortune.

Dale Long, Tyler, Tex. (Court-appointed), for Barfield.

Roby Hadden, U. S. Atty., H. Kelly Ireland, Asst. U. S. Atty., Tyler, Tex., Dennis R. Lewis, Asst. U. S. Atty., Beaumont, Tex., for plaintiff-appellee.

Before WISDOM and DYER, Circuit Judges, and KRAFT,* District Judge.

WISDOM, Circuit Judge:

Appellants Wayne Barfield and Larry Fate Fortune, together with Peter Gaston Kaiser, were convicted by a jury on a thirteen-count indictment that charged them with numerous federal offenses [1] related to the kidnaping of James Hoover, a Georgia stockbroker. On appeal, Barfield contends that the trial court erred in not granting his motion for judgment of acquittal because the totality of the evidence created a reasonable doubt as to his sanity at the time of the offense. Fortune joins in Barfield's argument and also contends that the trial court erred in allowing certain testimonial references to the issue of his competency to stand trial, and in admitting into evidence, as a government exhibit, a driver's license he used to conceal his identity at the time of his arrest. Kaiser does not join in this appeal. We find the appellants' contentions without merit. We affirm.

I

On September 7, 1973, Barfield, Fortune, and Kaiser seized James Hoover at gun point in Columbus, Georgia, and forced him to accompany them in his automobile to Tyler, Texas. The next morning, the defendants removed Hoover from the automobile, forced him into a ditch, fired eight bullets into his body, and left him for dead. The indestructible Mr. Hoover did not die. He crawled to a nearby house, was hospitalized, recovered, and testified at trial. In the afternoon of September 8, local police officers apprehended Barfield, Fortune, and Kaiser, in Colorado City, Texas. A federal grand jury in Tyler charged the defendants with numerous offenses in a thirteen-count indictment returned on September 21. Thereafter, on October 1, Judge Justice ordered the defendants committed to the Medical Center for Federal Prisoners in Springfield, Missouri, to determine whether they were then competent to stand trial, and whether they suffered from a mental disease or defect by which they lacked substantial capacity to appreciate the wrongfulness of their conduct at the time of the crime or to conform their conduct to the requirements of law.

The three defendants were transferred to the Federal Youth Center in Engle-

---

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

1. All three defendants were charged with kidnaping in violation of 18 U.S.C. § 1201, conspiracy to kidnap in violation of 18 U.S.C. § 1201(c), transportation of a stolen motor vehicle in interstate commerce in violation of 18 U.S.C. § 2312, unlawful transportation of firearms in violation of 18 U.S.C. § 924(b), and unlawful use of firearms in violation of 18 U.S.C. § 924(c). Fortune and Barfield were also charged with unlawful transportation of firearms in violation of 18 U.S.C. §§ 922(g) and 924(b).

wood, Colorado, where they were examined for ninety days by Dr. Jeffrey Anker and his staff. Dr. Anker concluded that the defendants were competent to stand trial. He failed to comply with the court order that also directed him to report on the sanity of the defendants at the time of the offenses. On defendants' motion, the court appointed Dr. Joe Oliver to examine the three defendants to determine whether they were suffering from a mental disease or defect, at the time of the offenses, that impaired their capacity to appreciate the wrongfulness of their conduct or to conform their conduct to the requirements of law. Dr. Oliver concluded that the defendants were sane and so testified at trial. The defendants, dissatisfied with Dr. Oliver's opinion, produced Dr. Anker, who testified that Barfield and Fortune were not sane at the time of the offenses.

## II

■ Barfield contends that statements made at trial by Judge Justice, Dr. Anker, and the prosecutor, improperly informed the jury that the defendants had been found competent to stand trial, and thus violated 18 U.S.C. § 4244. That section provides, in relevant part, that "[a] finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury." Barfield contends that Section 4244, as previously construed by this Court in Davis v. United States, 5 Cir. 1974, 496 F.2d 1026, compels the conclusion that the statements made at trial were improper and constitute reversible error. We disagree.

In Davis, the defendant had three separate competency hearings. On September 2, 1972, the district court conducted a competency hearing under 18 U.S.C. § 4244, found probable cause to believe that the defendant might be insane, and committed him to the Medical Center for Federal Prisoners, in Springfield, Missouri, for examination. After a competency hearing on November 27, 1972, the district court found that Davis was not competent to stand trial, despite an opposite conclusion by medical authorities at Springfield recommitted him under 18 U.S.C. § 4246, and requested a written report within six months. This report was received and the trial court, after a further competency hearing, found the defendant to be competent to stand trial on June 6, 1973. The trial took place on June 13–15, 1973.

The psychiatrist who examined Davis at Springfield testified at trial. On cross-examination, Davis's counsel attempted to introduce as evidence the court's order of November 28, 1972, finding the defendant incompetent to stand trial. The court admitted the evidence before the government was able to interpose an objection. On redirect examination, to offset the effect of the November order, the government then offered as evidence the court's June 6 order finding Davis competent to stand trial. The June 6 order was admitted without objection by the defense. On appeal, Davis argued that admission of the June 6 order violated the clear mandate of 18 U.S.C. § 4244 and constituted "plain error" within the meaning of Fed.R. Crim.P. 52(b). This Court agreed, holding that "[w]e discern plain error affecting substantial rights of the accused because of the specific prohibition of the introduction of evidence of a court finding of mental competency written by Congress into Sec. 4244." 496 F.2d at 1029.

In Davis, the trial court violated Section 4244 by admitting as evidence the very order that stated the court's finding that the defendant was competent to stand trial. That is not the case here. Barfield does not contend that the court violated Section 4244 by admitting any order that found him competent to stand trial. Instead, he contends that certain statements made by the court, the prosecutor, and Dr. Anker, informed the jury that Dr. Anker had, in fact, examined him to determine his competency to

stand trial. Those statements, together with the obvious fact that he is a defendant on trial, he suggests, would inevitably lead the jury to conclude that he was found competent to stand trial. In his view, any reference made during the course of trial to a competency examination would violate Section 4244 in that it would allow a finding of competency "otherwise [to] be brought to the attention of the jury."

■ While we agree with Barfield that any reference to a competency examination is undesirable in the context of a defense based on insanity, we think that the statutory construction he suggests is both unwarranted and unrealistic. In circumstances, as here, where the same psychiatrist has examined a defendant to determine sanity at the time of the offense, as well as competency to stand trial, it may well be impossible to prevent all references to the fact of a competency examination. Indeed, judicial gymnastics directed toward the annihilation of all such references may, in some circumstances, have a more undesirable effect, in terms of distortion of testimony, than would the references themselves. At any rate, Section 4244 does not require that result.

At trial, Dr. Anker testified for the defendants. He described his duties at Englewood and stated his opinion that Barfield and Fortune were insane under the rule stated by this Court in Blake v. United States, 5 Cir. 1969, 407 F.2d 908.[2] On cross-examination, government counsel asked Dr. Anker his reason for examining Barfield. He replied that Barfield "was referred to the Federal Youth Center at Englewood for a psychiatric evaluation to determine whether he was competent to stand trial". Defense counsel objected to this reference, and a conference was held out of the presence of the jury. Judge Justice told counsel that the prosecution was entitled to cross-examine the witness, but that he did not want to get into the issue of competency, to stand trial because it had no bearing on the case. Later, on direct examination, Fortune's counsel asked Dr. Anker why he had reason to examine Fortune. In order to distract the jury's attention from the competency issue, Judge Justice told the jury, simply, that "this court ordered mental examinations of all three of them". Implicit in the court's statement is the instruction that the jury should not consider the circumstances of the examination beyond the fact that it was ordered by the court.

Dr. Anker, as we have noted, was ordered by the court to report on both the competency and the sanity of the defendants. His report failed to state an opinion regarding sanity. During direct examination, Fortune's counsel suggested, possibly to establish a reason for Dr. Anker's failure to report on the sanity question, that the government had not provided the psychiatrist with a statement of the Blake test at the time of the examination. Government counsel objected to this suggestion and stated that it was the court's duty, not that of the government, to provide Dr. Anker with a formulation of the Blake test. To absolve the government of that responsibility, Judge Justice informed the jury of the circumstances relating to the examination. He said:

Well, let me tell the jury what happened. By order of this Court, the three defendants were subjected to psychiatric examination. They were to be examined as to their mental competency, as I recall it. It's not the fault of the Government.

2. In Blake, the court adopted the following standard for defining insanity:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."
407 F.2d at 916.

At no time did the trial court bring to the attention of the jury its *finding* that the defendants were competent to stand trial. Indeed, Judge Justice carefully instructed them that the issue of competency to stand trial was irrelevant to any question they had to determine. He said:

I want to make it very plain that the issue before you in relation to this case is not whether or not this defendant is able to understand what is going on and is able to understand that he is on trial and things of that nature. The question before you is whether or not he was able to conform—whether or not he had a mental defect and whether or not he was able to conform his conduct to the standards required by law. Now, that's what this witness is testifying about. And it has nothing whatever to do with whether or not he is capable of understanding what is going on here at the Court.

The trial court's manifest intention, and the effect of its instruction, was to focus the attention of the jury on the issue of insanity and to prevent the jury's considering whether the defendants had previously been found competent to stand trial. We do not concur in Barfield's hypothesis that Judge Justice's remarks "could serve only to cement in the minds of the Jurors the fact that Appellant had indeed been found competent to stand trial." Certainly, those remarks did not serve to bring the court's *finding* of competency to the attention of the jury in violation of Section 4244. This is demonstrated by our consideration of similar circumstances in United States v. Harper, 5 Cir. 1971, 450 F.2d 1032.

In *Harper*, the defendant argued that the trial court violated Section 4244 by permitting two psychiatrists to testify that they examined him under a court order to determine whether he was mentally competent to stand trial and that they found him to be mentally competent. Their contention was that the express purpose of the statute is to prevent the jury from learning that the court

has ordered a mental examination. This court explicitly rejected that expansive reading of Section 4244. We said:

The only evidence ruled inadmissible by . . . the statute is the *trial judge's finding* that the accused is competent to stand trial. In this case neither Dr. Hubbert nor Dr. Fain mentioned that the trial court had found Harper competent to stand trial. Each testified merely that he had examined Harper and found him mentally competent at the time of the examination. Moreover, the doctors' only mention of the court's examination order came in brief response to the question, "How did you come to know Harper?" In these circumstances, we conclude that the doctors' testimony did not violate 18 U.S.C. § 4244.

450 F.2d at 1035–36 (emphasis in original). See also Edmonds v. United States, 1959, 106 U.S.App.D.C. 373, 273 F.2d 108, 114 (en banc); Bailey v. United States, 1957, 101 U.S.App.D.C. 236, 248 F.2d 558, 560.

References to the competency examination are more numerous here than they were in *Harper*. Nonetheless, we think that they are of the same character. The trial court's finding was not admitted into evidence. References to the competency examination were limited to demonstrating the circumstances in which the psychiatrist came to know and examine the defendants, and to determining why Dr. Anker, who was now willing to testify as to their sanity, had not fulfilled the mandate of the court order by reporting to the court on the sanity issue at the time of his examination. These limited references to the competency examination were essential to the meaningful presentation of issues properly before the jury.

While we find no violation of Section 4244 in the circumstances here, we must, nonetheless, emphasize that trial courts should be vigilant in minimizing unnecessary references to competency issues. References that are irrelevant and are elicited in bad faith may indeed have

a prejudicial effect on the defendant's right to a fair trial on the issue of sanity. They must not be tolerated.

## III

As his second assignment of error, Barfield contends that the trial court erred in failing to find as a matter of law, at the close of the evidence, that there existed a reasonable doubt as to his sanity. Fortune makes a similar contention as to his sanity.

■■■ At trial, Dr. Anker testified on behalf of Barfield and Fortune, stating his opinion that the two men were not sane, under the *Blake* test, at the time of the offenses. The burden of proof, in these circumstances is clear. "The sanity of the accused is always an element of the offense charged; and the presumption of sanity, standing in the place of evidence when no question is raised about the issue, takes care of the prosecution's burden of proving sanity. But when evidence of insanity is received, regardless of the source, that presumption disappears, and the prosecution has the burden of proving the mental capacity of the accused beyond a reasonable doubt." Mims v. United States, 5 Cir. 1967, 375 F.2d 135, 140. Here, Dr. Anker's testimony was sufficient to rebut the customary presumption of sanity, and shifted to the government the burden of proving the defendants' mental capacity beyond a reasonable doubt. Barfield and Fortune contend that the government's evidence was insufficient to meet-its burden of proof or to create a genuine issue of fact for the jury. We disagree.

Both expert and lay testimony on the issue of sanity was presented at trial. With regard to Fortune, Dr. Anker noted limited intelligence, childish behavior, paranoia and alienation from society, some evidence of schizophrenia, but no psychosis, and concluded that, because of mental defect, Fortune was "not able to conform his conduct or behavior to the requirements of law" at the time of the offenses. Dr. Oliver noted Fortune's

limited intelligence and his poor control of impulses, but disagreed with Dr. Anker's diagnosis of latent schizophrenia. He found Fortune logical, rational and coherent, with no evidence of thought disorder or delusional content, and concluded that Fortune "did not have a mental disease or defect causing a substantial lack of capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law."

With regard to Barfield, Dr. Anker observed limited intelligence, poor judgment, emotional instability, and alienation from society, but no evidence of psychosis. He concluded that, because of mental defect, Barfield was not able to conform his conduct or behavior to the requirements of law at the time of the offenses. Dr. Oliver also noted Barfield's limited intelligence and poor control of his impulses. He found no evidence of schizophrenia, and observed that Barfield was rational, logical, and coherent. He also found no evidence of thought disorder and concluded that Barfield "did not have a mental disease or defect causing a substantial lack of capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law".

Fortune's sister, Sharon Stinson, testified concerning his childhood behavior patterns, and Sheriff's Department employee Alice Lane testified concerning his behavior during confinement. James Hoover, the victim, stated unequivocally his belief that the defendants' acts, during the fifteen hours that he had occasion to observe them at close quarters, were not those of insane persons, but seemed to him to be both knowing and premeditated.

■■■ The appellants contend that the evidence of their insanity was overwhelming and that Dr. Oliver's testimony, predicated on a "quickie jail-house examination," should not be permitted to support the jury's finding of sanity beyond a reasonable doubt. In effect, the appellants ask us to formulate a *per se* rule that would prevent a jury from

weighing and evaluating conflicting expert testimony where one expert has had greater opportunities for observation than has another. The thrust of their argument is that this court should hold, as a matter of law, that Dr. Oliver's expert testimony could not overcome that of Dr. Anker because Dr. Anker examined the defendants for short periods of time, sometimes for only ten or fifteen minutes, over a three-month period, while Dr. Oliver examined the defendants only once for a period of one or two hours. Moreover, the appellants contend that Dr. Anker's testimony was preferable to Dr. Oliver's because Dr. Anker had occasion to examine the three defendants together, and thus was able to form a judgment as to the social dynamics of their relationships. These arguments may have been relevant and material to the decision the jury was required to make regarding the relative weight to be given the conflicting evidence on sanity. They are not relevant to our review of the jury's verdict, which must be sustained if there is substantial evidence to support it, taking the view most favorable to the government. Lacaze v. United States, 5 Cir. 1968, 391 F.2d 516; Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

■ The responsibility for evaluating the conflicting expert testimony rests, of course, with the jury. As Judge Bazelon has suggested, "[t]he Government can best meet its burden by bringing forth from psychiatric witnesses both the conclusion of 'no mental illness' and a full explanation of the dynamics of the defendant's personality." Rollerson v. United States, 1964, 132 U.S.App.D.C. 10, 343 F.2d 269. If an expert psychiatric witness states both his ultimate conclusion of sanity or insanity, in terms of the *Blake* test, and the facts and circumstances underlying that conclusion, the jury will be best prepared to determine the defendant's sanity.

■ Expert testimony is not necessary for the government to meet its burden. A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the government attempts to rebut it without any expert witnesses. United States v. McCracken, 5 Cir. 1974, 488 F.2d 406; United States v. Pitts, 5 Cir. 1970, 428 F.2d 534, cert. denied, 1970, 400 U.S. 910, 91 S.Ct. 154, 27 L.Ed.2d 149; Mims v. United States, 5 Cir. 1967, 375 F.2d 135. While a jury may not arbitrarily disregard expert testimony, it also may not give conclusive effect to the opinion of an expert merely because that opinion is not challenged by some other expert. United States v. Harper, 5 Cir. 1971, 450 F.2d 1032.

■ The record here demonstrates that the jury chose to believe Dr. Oliver and Mr. Hoover, and was unconvinced by the testimony of Dr. Anker, Mrs. Stinson, and Mrs. Lane. Given the considered and extensive testimony of all the witnesses who testified on the sanity issue, we cannot say that the jury arbitrarily disregarded Dr. Anker's testimony.

■ The guiding principle here, and "one of the most generally accepted rules of all jurisprudence, state and federal, civil and criminal, is that the questions of *credibility* and *weight* of expert opinion testimony are for the trier of facts, and that such testimony is ordinarily not conclusive even where it is uncontradicted." Mims v. United States, 5 Cir. 1967, 375 F.2d at 140 (emphasis in original). Moreover, "[t]he sound rule is that the issue of insanity, when raised as a defense in a criminal case, should be determined by the jury from all the evidence, rather than from the opinions of experts alone, subject to the control that the court may always set aside an unreasonable verdict." *Id.,* 375 F.2d at 143. Under this rule, a jury verdict may be set aside as unreasonable, for example, when it is supported by psychiatric opinion testimony that fails to state an opinion regarding an essential element of the *Blake* test, "either in express words or in terms which fairly convey that standard", or when a psychiatrist bases his

opinion on an essential factual assumption that is erroneous. United States v. Parks, 5 Cir. 1972, 460 F.2d 736. No such testimonial defect was present here. The two psychiatrists made substantially similar findings of fact concerning the personality dynamics of the two defendants. Only in their ultimate conclusions, in their respective opinions as to the defendants' sanity or insanity under the *Blake* test, did they substantially disagree. We think that this ultimate disagreement presented a paradigmatic jury question.

■ Finally, Barfield contends that Dr. Oliver's expert opinion is legally infirm, in the sense that the expert testimony was defective in United States v. Parks, 5 Cir. 1972, 460 F.2d 736, because Dr. Oliver was not aware of the *Blake* test at the time of his examinations of Barfield and Fortune. It is true that Dr. Oliver is a Texas psychiatrist and that, at the time of his examination, a *Blake* or ALI standard of criminal responsibility was not recognized in Texas courts, which then followed a *M'Naghten* standard. Moreover, Dr. Oliver had previously testified only in state courts. Nonetheless, after he was familiarized with the *Blake* test, Dr. Oliver testified unequivocally that Barfield "did not have a mental disease or defect to the extent that he lacked substantial quality to know, understand the wrongfulness of his conduct" and that he was able to conform his conduct to the requirements of law. In *Parks,* the government psychiatrist "never testified in so many words or in any variation conveying substantially the same meaning that Parks was able to conform his conduct to the requirements of the law—and that is what the Government had to show." 460 F.2d 744. Moreover, the psychiatrist in *Parks* based his opinion on an incorrect factual assumption concerning the defendant's psychiatric history. Dr. Oliver's opinion, based on correct factual assumptions and stated in the language of *Blake,* forecloses our concurrence in Barfield's view that it was based on a misapprehension of law akin to the infirmities of the expert testimony in *Parks.*

## IV

■ At trial, the Colorado City police officer who arrested the defendants testified that several items had been taken from them and from their automobile at the time of their arrest. The defendants were stopped for a routine traffic violation unrelated to the kidnaping. When the police asked the driver, Fortune, for identification, he produced the license of one Charles James White. Challenged, Fortune then produced Hoover's license. White's driver's license was admitted into evidence over the defendant's objection. Fortune contends that the driver's license was irrelevant to any issue in the case and could serve only to inflame the jury by causing them to suspect that White was the victim of a similar crime at the hands of the defendants. Of course, there are many possible explanations of how Fortune may have come to have the driver's license in question. We do not think that the necessary effect of its admission into evidence would be to inflame the jury by causing them to envision the facts of a similar crime. If the admission of the evidence was error, it was certainly harmless error under Fed. R.Crim.P. 52(a).

\* \* \* \* \* \*

The judgment of the district court is affirmed.