UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph Morris HALL,
Defendant-Appellant.

No. 77-5256.

United States Court of Appeals,
Fifth Circuit.

Nov. 13, 1978.

Theodore J. Sakowitz, Federal Public Defender, Paul M. Korchin, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Robert W. Rust, Former U. S. Atty., Kevin M. Moore, A. Scott Miller, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before JONES, RONEY and TJOFLAT, Circuit Judges.

RONEY, Circuit Judge:

Defendant was indicted for violating 18 U.S.C.A. § 871 by knowingly and willfully making a threat against the President of the United States. At trial, defendant presented expert testimony that at the time he made the threatening call, he was "insane" by reason of "alcohol deterioration" and thus lacked the requisite specific intent. The jury found defendant guilty and he brought this appeal, alleging that the district court erred in denying his motion for judgment of acquittal and allowing the case to go to the jury. Defendant claims that the Government, which did not present any expert testimony, failed to rebut defendant's proof of his insanity.

Defendant's expert witness, a psychiatrist, testified that defendant suffered from a specific psychiatric syndrome known as "alcohol deterioration," which makes defendant "insane" only when intoxicated. The doctor also stated that someone with this disease could be intoxicated without showing signs of intoxication. The federal agents and police officers who had contact with defendant on the night in question testified that defendant did not appear to be intoxicated. If believed, their testimony could serve to rebut the factual predicate for the defense expert's opinion of insanity. Alternatively, of course, their observations could be interpreted by the jury as consistent with the doctor's description of the disease. This choice was for the jury to make. The facts were not such that a reasonably minded juror must necessarily have had a reasonable doubt as to defendant's legal sanity at the time of the offense. We hold that, on the facts of this case, the Government presented sufficient evidence of defendant's sanity to get to the jury, and therefore affirm.

### The Trial Testimony

1. *The Government's Case*

The Miami office of the FBI received four calls from defendant Joseph Morris Hall on the night of October 17, 1976. The character of the first three calls was very different from the final call. It was only during the final call that defendant made any threats against the President.

Agent Rivers of the FBI, who spoke with defendant during all four calls, received the first call at approximately 8:00 p. m. Agent Rivers testified that he thought the caller could have been drinking at the time. Indeed, the caller indicated he was calling from a bar. The caller's words were slurred, and his speech was rambling, incoherent and lacking any continuity of thought. Agent Rivers, describing the caller as an "incoherent conversationalist," said the call made no sense to him and was so incoherent that he could not recall what the conversation was about.

The second and third calls were similar to the first. Agent Rivers recognized the caller's voice and speech patterns as the same. Rivers said the caller seemed to be in the same state as during the first call: the caller's conversation was still rambling and incoherent, and his speech was slurred.

Defendant's fourth call was received by an FBI security clerk at 11:10 p. m. Defendant was coherent and speaking in complete sentences. He sounded irritated and angry, and he was yelling much of the time. Defendant spoke of his general dissatisfaction with the Government. He then mentioned how easy it is for a president to be assassinated. He referred to President Kennedy being assassinated in spite of the Secret Service's protection. Defendant then spoke "at some length" about the ease with which the assassination took place. Defendant stated that former President Nixon would have been assassinated if he had not left office when he did, and that then-President Ford was no better than Nixon. Defendant then stated that he felt an obligation to eliminate the President. This statement occurred. after defendant had been talking with the agent for eight minutes.

The agent advised defendant of the seriousness of such statements and that it is a federal offense to make such threats. Defendant continued in what the agent characterized as "an assassination-type of theme." The agent therefore turned the

call over to Agent Rivers, indicating to Rivers that he had just received a threat to kill the President.

Rivers testified that he recognized the caller as the same one he had spoken to earlier in the evening, because of the same tone in the voice. During the fourth call, however, Rivers said that defendant's conversation was much more lucid, more angry, and more violent. Defendant was now making complete sentences and coherent statements. He was in a very highly angered state and sometimes used profanity. The basic theme of his conversation was that President Ford had sold the country out to the Communists, and defendant felt it was his duty to eliminate the President. Rivers told defendant that he could be prosecuted for making such statements, and tried to calm defendant down. The conversation lasted until 12:05 a. m.

Defendant told Agent Rivers that he was in a telephone booth outside the Tomboy Club in Miami, and the FBI notified the local police. Officers Hemond and Caruso responded. They testified at trial that defendant was still speaking on the telephone when they arrived, and he did not attempt to hang up or flee. The officers asked defendant who he was talking to, and he replied that he was talking to his girlfriend. Officer Hemond took the telephone from defendant, and the person on the other end identified himself as Agent Rivers. The officers then arrested defendant and took him to the police station.

Both police officers testified that they did not believe defendant was intoxicated. Officer Caruso had been a breathalizer technician and had received training in the detection of intoxication. Officer Hemond had also received training in this field. During the course of their employment as police officers, they both had observed many individuals who were under the influence of alcohol. The officers told of the characteristics used to determine if someone is under the influence. They look for slurred speech, bloodshot eyes, flushed complexion, the odor of alcohol, whether the person can stand properly and walk without staggering, and whether his clothing is disarrayed. Based on these indications, both officers testified that defendant was not intoxicated.

Officer Hemond testified that defendant's speech was not slurred, defendant's complexion was not flushed, defendant had no difficulty standing or walking, and defendant was neatly dressed. While defendant's breath smelled of alcohol, defendant "did not appear to [him] to be under the influence to where his faculties were impaired." Officer Caruso testified that defendant's speech was not slurred, and defendant was able to stand and walk. Since defendant's eyes were bloodshot and his breath smelled of alcohol, Officer Caruso concluded, "after listening to [defendant] and watching his balance and the way he carried himself and everything," that while defendant had been drinking, defendant was not intoxicated.

The Government's final witness was a Secret Service agent who saw defendant shortly after defendant was brought to the police station. He testified that although defendant's breath smelled of alcohol, defendant did not have any trouble with his speech, was lucid and coherent, and was neatly dressed. In his opinion, defendant was not intoxicated.

In addition to the live testimony, the Government introduced into evidence the record of defendant's prior (1973) conviction under 18 U.S.C.A. § 871 for knowingly and willfully threatening to harm the President. The court correctly admitted this, with proper limiting instructions, as evidence of defendant's intent.[1]

## 2. The Defense Case

The defense presented two witnesses. The first, defendant's niece, testified that

---

1. While defendant's brief challenged the court's admission of the prior conviction, defense counsel conceded at oral argument that the court's action was proper under our decision in *United States v. Kirk*, 528 F.2d 1057 (5th Cir.

1976). In *Kirk*, defendant was arrested for threatening to kill the president. His sole defense was lack of criminal intent based on his intoxication. Over objection, the Government introduced defendant's prior conviction under

she had seen defendant in a bar from about 9:50 to 10:15 p. m. on the night of October 17, and that defendant was drinking the whole time. She testified that defendant's "eyes were real red, his speech was blurred, and he was kind of staggering." She concluded that at that time, defendant was "very much" under the influence of alcohol.

Defendant's main witness was Dr. Charles Mutter, a psychiatrist who had examined defendant for one hour some four months after the offense. He testified that it was his opinion that on October 17, 1976, defendant "was suffering from a condition which is known as chronic alcoholism or alcohol deterioration."

Dr. Mutter described alcohol deterioration as a disease which may strike an individual who "is a drinker of long duration." When someone with this disease drinks and becomes intoxicated, he may be very confused and disorganized and may have a type of personality change where he becomes hostile and combative. He may make threats or become suicidal. While his thoughts are initially disorganized and confused, as the condition progresses he becomes more organized in thought but still very hostile and combative. At this point he will appear normal, i. e., sober, but he is still intoxicated. This latter stage is often followed by a period of memory loss.

Dr. Mutter testified that when he examined defendant, defendant exhibited such a memory loss about what happened on the evening of October 17. The doctor said that until he told defendant, defendant was not aware he had this condition.

Defense counsel asked the doctor a hypothetical question containing a summary of the testimony of the Government witnesses. Counsel told Dr. Mutter to assume that the testimony was true, and asked whether that changed his opinion. The doctor replied that it did not. He said that such testimony was consistent with and supported his diagnosis, because what the Government witnesses described "is the classic textbook description of alcohol deterioration." [2]

Dr. Mutter concluded by stating his opinion that on October 17, 1976, defendant

---

§ 871, which had occurred some three years previously. We upheld the district court's action, stating:

[W]e believe that a prior conviction is relevant to an intoxication defense. Whether the prior conviction tended to show that defendant made this threat intentionally or as the result of "alcohol talking," was a matter for the jury's determination. The fact that the former offense occurred three years prior to the offense charged does not make it so remote as to be excluded.

*Id.* at 1061.

As defense counsel admits, *Kirk* is controlling here. The present case involves not an intoxication defense but an insanity defense (albeit insanity because of intoxication). Both defenses, however, are similar, since both go to lack of mental capacity. *See United States v. Trujillo,* 497 F.2d 408, 409 (10th Cir. 1974). Thus, the prior conviction was properly admitted here to show whether defendant made the threat intentionally or as the result of insanity because of "alcohol [deterioration] talking."

2. The colloquy between defense counsel and Dr. Mutter was as follows:

[Defense counsel]

Q Doctor, I would like you to take certain facts into consideration and I would like you to tell us whether these facts have any effect upon your opinion or if they change your opinion in any way.

I would like you to assume that around 8:30 to nine o'clock on the night of October 17, 1976, someone sounded rambling, incoherent, and his voice was slurred over the telephone. But at approximately from 11:10 p. m. to midnight of the same night in question, this person's speech was not slurred, it sounded coherent, it sounded angry and violent. In addition, I would like you to assume that at midnight this person was seen by others who indicated that the person had the smell of alcohol on his breath, had bloodshot eyes, but his speech was not slurred and this person seemed to have control over his movements.

Taking all those facts into consideration, is your opinion changed by those facts?

[Dr. Mutter]

A No. This would only support the diagnosis I made. It is consistent.

Q Why is that, Doctor?

A Well, that is the classic textbook description of alcohol deterioration.

Usually, most people think that when you drink and you become more and progressively intoxicated, you fall down drunk and you can't move or you go into a stupor or deep sleep. This does help with certain individuals, except this particular type of condition usually may become more confused and disoriented. And as the drinking progresses their speech becomes clear but they become more hostile and

"lacked substantial mental capacity to conform his behavior to the requirements of the law, which was a direct result of the type of intoxication and deterioration that he suffered." Dr. Mutter's opinion was phrased in terms of the *Blake* definition of insanity employed in this Circuit. *Blake v. United States*, 407 F.2d 908, 916 (5th Cir. 1969) (en banc).

### 3. The Government's Cross-Examination of the Defense Expert

On cross-examination, Dr. Mutter agreed defendant knew right from wrong. Dr. Mutter said that if defendant was sober on October 17, 1976, that he would have known it was wrong to threaten the President. The doctor also admitted that it is usually difficult to make a retrospective analysis of a person's mental state at some specific time in the past, especially when the only source of information is the patient himself. He stated, however, that he had made retrospective determinations before, and in this case he was convinced that defendant had been truthful and cooperative during the hour he examined him.

The defense then rested. The Government rested without presenting any rebuttal evidence. Defendant moved for a judgment of acquittal, but the judge allowed the case to go to the jury, which found defendant guilty.

### The Insanity Defense

The sanity of the accused is always an element of the offense charged.[3]

When no question of insanity is raised, the Government's burden of proving defendant's sanity is satisfied by the presumption of sanity, which stands in the place of evidence. When, however, "some" evidence, which need only be "slight," of a defendant's lack of capacity is introduced at trial, the presumption is insufficient to carry the issue and the Government must prove defendant's sanity beyond a reasonable doubt.[3]

Evaluating the sufficiency of the evidence of a defendant's sanity is a difficult task, at either the trial or appellate level.[4] Each case must be decided upon its own facts, with careful attention to the weight of the evidence on each side. The nature and quantum of rebuttal evidence which the Government must offer to present a jury question is to some degree determined by the strength of defendant's case for insanity.[5]

Of course, the sufficiency of the evidence necessary to make an issue for the jury on the defense of insanity, as well as whether the evidence establishes as a matter of law a reasonable doubt as to a defendant's sanity, is ultimately for the court.[6] The test we employ is whether a reasonably minded juror must necessarily have had a reasonable doubt as to the defendant's legal sanity at the time of the offense.[7]

It is not necessary for the Government to present any expert testimony to

---

combative. And assuming that he is drinking progressively throughout that period, that would be consistent with this type of diagnosis and condition.

   *    *    *    *    *

This is an atypical or unusual type of alcoholic reaction. It is different from the usual and ordinary state of drunkenness.

3. *United States v. Phillips*, 519 F.2d 48, 49 (5th Cir. 1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); *United States v. Fortune*, 513 F.2d 883, 889 (5th Cir.), *cert. denied*, 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975); *United States v. McCracken*, 488 F.2d 406, 409 (5th Cir. 1974); *Mims v. United States*, 375 F.2d 135, 140 (5th Cir. 1967).

4. *United States v. McCracken*, 488 F.2d 406, 409 (5th Cir. 1974).

5. *United States v. Fratus*, 530 F.2d 644, 648 (5th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976).

6. *United States v. Bass*, 490 F.2d 846, 850 (5th Cir. 1974).

7. *United States v. Parks*, 460 F.2d 736, 745 (5th Cir. 1972); *Blake v. United States*, 407 F.2d 908, 912 (5th Cir. 1969) (en banc).

meet its burden of proof. The Government can meet its burden through the testimony of lay witnesses.[8] A defendant is not entitled to a judgment of acquittal simply because he offers expert testimony on the issue of insanity and the Government attempts to rebut it without any expert witnesses.[9] The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony.[10]

In Dr. Mutter's expert opinion, defendant was insane only when intoxicated. He specifically stated during cross-examination that if defendant was sober on the night of October 17, 1976, then defendant was not insane when he made the threatening call. Thus, Government proof that defendant was not intoxicated at the time of the offense would rebut the factual predicate for the expert's opinion of insanity, and allow the case to go to the jury. Prior cases involving insanity by intoxication or intoxication defenses have held that there was sufficient evidence to go to the jury where the Government presented lay witnesses who testified that defendant was sober at the time the offense was committed.[11]

This case is substantially harder than a normal intoxication situation, where a defendant would appear intoxicated if he was intoxicated. In Dr. Mutter's words, alcohol deterioration caused in defendant "an atypical or unusual type of alcoholic reaction . . . different from the usual and ordinary state of drunkenness." Thus, according to Dr. Mutter, defendant could be intoxicated without appearing intoxicated.

Defendant argues that since an appearance of sobriety is consistent with the symptoms of alcohol deterioration described by Dr. Mutter, the Government's proof supported, rather than rebutted, the doctor's testimony. Although this argument is appealing from a theoretical viewpoint, in our judgment it cannot control this case. The expert admitted the difficulty in making his decision, one which when made becomes almost irrefutable. The wiser course, we think, is to submit the case to the jury to decide whether defendant has the mental incapacity of drunkenness, while looking sober, or is in fact sober, and therefore not insane under the expert's analysis.

■ The police officers and other agents gave detailed descriptions of defendant's conduct and appearance. Because of the peculiarities of alcohol deterioration, the facts they described will support two alternative conclusions: (1) the normal conclusion that defendant was not intoxicated, or (2) the more unusual conclusion that he was in the latter stages of alcohol deterioration and thus was intoxicated even though he did not so appear. The doctor drew the latter conclusion; five lay Government witnesses drew the conclusion that defendant was not intoxicated. The decision as to which opinion is correct is for the jury.

Accordingly, the evidence was not such that a reasonably minded juror must necessarily have had a reasonable doubt as to defendant's legal sanity at the time of the offense. The case was properly submitted to the jury, and the jury's finding of guilt is supported by substantial evidence.

AFFIRMED.

**8.** See, e. g., Brock v. United States, 387 F.2d 254, 257 (5th Cir. 1967), and cases cited therein. Accord, United States v. Dresser, 542 F.2d 737, 742 (8th Cir. 1976); Dusky v. United States, 295 F.2d 743, 754 (8th Cir. 1961) (opinion by Judge, now Justice, Blackmun), cert. denied, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962).

**9.** E. g., United States v. Fortune, 513 F.2d 883, 890 (5th Cir.), cert. denied, 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975).

**10.** Brock v. United States, 387 F.2d 254, 257 (5th Cir. 1967). See United States v. Fortune, 513 F.2d 883, 890 (5th Cir.), cert. denied, 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975); United States v. McCracken, 488 F.2d 406, 412 (5th Cir. 1974); United States v. Harper, 450 F.2d 1032, 1037 (5th Cir. 1971); Mims v. United States, 375 F.2d 135, 140–143 (5th Cir. 1967).

**11.** See, e. g., United States v. Smith, 552 F.2d 257, 260 (8th Cir. 1977); Hawkins v. United States, 114 U.S.App.D.C. 44, 47, 310 F.2d 849, 852 (1962).