[Cite as *Bickerstaff v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-2364.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Linda J. Bickerstaff, Admx., | : | |
| Plaintiff-Appellant, | : | |
| v. | : | No. 13AP-1028 |
| | | (Ct. of Cl. No. 2012-03409) |
| Ohio Department of Rehabilitation and Correction, | : | |
| | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |
| | : | |
| Vincent Mastaso, III, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 13AP-1029 |
| v. | : | (Ct. of Cl. No. 2012-03417) |
| | : | |
| Ohio Department of Rehabilitation and Correction, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

# D E C I S I O N

## Rendered on June 3, 2014

*Blakemore, Meeker & Bowler Co., L.P.A.*, *Robert C. Meeker*, and *Michael B. Bowler*, for appellants Linda J. Bickerstaff, Admx., and Vincent Mastaso, III.

*Mike DeWine*, Attorney General, and *Eric A. Walker*, for appellee.

## APPEALS from the Court of Claims of Ohio

LUPER SCHUSTER, J.

{¶ 1} Plaintiffs-appellants Linda J. Bickerstaff, administratrix of the estate of Dalin David Anderson, and Vincent Mastaso, III, appeal from a judgment of the Court of

Claims of Ohio entering judgment for defendant-appellee, Ohio Department of Rehabilitation and Correction, on appellants' complaints alleging appellee's negligence caused the wrongful death of Anderson and the bodily injury of Mastaso. Because the trial court did not err in determining appellee was not negligent in failing to close the recreation yard prior to the lightning strike, we affirm.

## I. Facts and Procedural History

{¶ 2} On April 12, 2012, appellants each filed separate complaints against appellee asserting appellee knew or should have known adverse weather conditions were approaching the recreation yard of the Belmont Correctional Institution ("BCI") honor camp on May 31, 2010 but, nonetheless, negligently failed to close the recreation yard prior to the onset of inclement weather. Mastaso alleged that as a result of appellee's negligence in failing to deploy corrections officers to the recreation yard and failing to order the recreation yard closed in a timely manner, "[l]ightning struck [Mastaso] on his right foot, from which the current traveled upward throughout his body and head and exited his left eye, causing a fracture in his left eye." (Mastaso Complaint, ¶ 19.) Bickerstaff alleged that as a result of appellee's negligence, lightning struck Anderson causing him to immediately fall to the ground motionless and resulted in Anderson's "instant demise." (Bickerstaff Complaint, ¶ 21.) Bickerstaff filed the complaint on behalf of Anderson's estate. Appellants' complaints each asserted claims for negligence, negligent supervision and training, and reckless and wanton conduct.

{¶ 3} Because appellants' claims were factually interrelated, the trial court consolidated the two cases for the sole purpose of determining the issue of liability. The trial court assigned the consolidated case to a magistrate on February 14, 2013.

{¶ 4} On February 25, 2013, appellee filed a motion for summary judgment which the trial court denied on April 5, 2013. The liability trial before the magistrate occurred May 6 and 7, 2013. All parties filed post-trial briefs.

{¶ 5} On August 8, 2013, the magistrate issued a decision determining appellee did not have a duty to close the recreation yard and that the lightning strike was an act of God. Thus, the magistrate concluded appellee was not liable for appellants' injuries. Appellants filed objections to the magistrate's decision on August 22, 2013. The trial

court overruled appellants' objections and adopted the magistrate's decision in an October 31, 2013 judgment entry. Appellants timely appealed.

## II. Assignments of Error

{¶ 6} On appeal, appellants assign the following four assignments of error for our review:

[1.] The trial court committed reversible error by disregarding the uncontradicted testimony of appellants' expert witness.

[2.] The trial court's judgment is against the manifest weight of the evidence and is not supported by any competent and credible evidence and is not supported by sufficient evidence.

[3.] The trial court erred as a matter of law in allocating an affirmative duty by appellants to remove themselves from the recreation yard.

[4.] The trial court erred as a matter of law when it held that the post orders were mere guidelines that do not confer rights on inmates.

## III. First, Second, and Third Assignments of Error – Fast-Moving Storm and Act of God

{¶ 7} Appellants' first, second, and third assignments of error are interrelated, and we address them together. Appellants assert through their first three assignments of error that the trial court erred in determining appellee was not negligent because the storm was fast-moving and was an act of God. More specifically, appellants argue (1) the judgment is against the manifest weight of the evidence, is not supported by competent, credible evidence, and is not supported by sufficient evidence; (2) the trial court erred in disregarding the testimony of appellants' expert witness; and (3) the trial court erred in allocating an affirmative duty to the inmates to remove themselves from the recreation yard.

### A. Manifest Weight of the Evidence

{¶ 8} In their second assignment of error, appellants argue the trial court's judgment is against the manifest weight of the evidence, is not supported by competent, credible evidence, and is not supported by sufficient evidence. In particular, appellants challenge the trial court's conclusions that appellee did not breach its duty of reasonable care and that the injuries were solely attributable to an act of God.

{¶ 9} Because appellants allege appellee was negligent, appellants were required to show the existence of a duty, a breach of that duty, and an injury proximately caused by the breach. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984). Where there is a custodial relationship between the state and its prisoners, the state owes a common law duty of reasonable care and protection from unreasonable risks. *McCoy v. Engle*, 42 Ohio App.3d 204, 207-08 (10th Dist.1987). Reasonable care is the degree of caution and foresight that an ordinarily prudent person would employ in similar circumstances. *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 745 (10th Dist.1998). While the state is not an insurer of the safety of its prisoners, once it becomes aware of a dangerous condition in the prison, it is required to take reasonable steps necessary to avoid injury to prisoners. *Nott v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-842, 2010-Ohio-1588, ¶ 8, citing *Clemets v. Heston*, 20 Ohio App.3d 132, 136 (6th Dist.1985). However, prisoners are also required to use reasonable care to ensure their own safety. *Id.*, citing *Macklin v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 01AP-293, 2002-Ohio-5069, ¶ 21.

{¶ 10} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. In determining whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by the presumption that the findings of the trial court are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* Thus, the relative weight to be given witness testimony and the credibility to be afforded each of the witnesses is a question for the trier of fact. *Rahman v. Ohio Dept. of Transp.*, 10th Dist. No. 05AP-439, 2006-Ohio-3013, ¶ 36.

{¶ 11} BCI had in place a "Standard Operating Procedure for Severe Weather Approaching" at the time of the fatal lightning strike. (Plaintiff's exhibit No. 8.) This standard operating procedure stated that "when any staff member witnesses a lightning

strike they notify the shift commander and initiate the process of clearing the Yard due to lightning." (Plaintiff's exhibit No. 8.) The shift commander is then to call over the radio to close the yard, at which time the yard officers will close the yard and order the inmates indoors and off the recreation yard. Once the yard has been closed due to lightning, the inmates are to stay in their designated areas. It is appellants' position that the storm developed slowly and thus appellee breached a duty of care to the inmates when it did not close the recreation yard prior to the fatal lightning strike.

{¶ 12} Appellants first challenge the magistrate's conclusion adopted by the trial court that the storm was fast-moving rather than slow-moving. According to appellants, the evidence at trial demonstrated appellee had or should have had ample warning that the storm was approaching and the fatal lightning strike, thus, was not an act of God as the trial court concluded. "While it has long been the rule of law in Ohio that a defendant cannot be held liable for an act of God which causes injury to the plaintiff, it has also long been the rule of law that, '[i]f proper care and diligence [on a defendant's part] would have avoided the act, it is not excusable as the act of God.' " *Bier v. New Philadelphia*, 11 Ohio St.3d 134, 135 (1984), quoting *Lodwicks & Kennedy v. Ohio Ins. Co.*, 5 Ohio 433, 437 (1832), *overruled in part on other grounds.*

{¶ 13} The magistrate explained in his decision that the video of the recreation yard from the day of the lightning strike corroborated the testimony of other witnesses that the storm appeared suddenly. The video starts at 6:00 p.m. on May 31, 2010 and continues through 6:23 p.m. that day. The lightning strike occurred at approximately 6:20 p.m. Although the sky is not clearly visible in the video, the footage shows a crowded recreation yard with inmates playing basketball and engaging in various recreational activities. At various times shadows appear on the ground indicating the sun was shining intermittently during that time period. It is not until 6:19 p.m. that rain suddenly appears and the inmates scatter to seek shelter from the rain. The sun then reappears briefly before the video abruptly cuts off. When the video resumes moments later, it is raining heavily. There is no indication from the video that anyone in the recreation yard witnessed any lightning or feared for their safety prior to that time.

{¶ 14} As the magistrate noted, the video corroborates the testimony of some of the inmates that the storm seemed to appear out of nowhere. One former BCI inmate who

participated in recreational activity on May 31, 2010, Richard Griffin, testified he neither heard any thunder nor saw any lightning prior to the "extremely loud thunder" coupled with the "instantaneous" flash of lightning that struck Mastaso and Anderson. (Griffin Depo., 10.) Griffin further testified that "all of a sudden it just got dark," and that the nearly simultaneous thunder and lightning occurred "before the rain even hit us." (Griffin Depo., 11-12.) Griffin described the sudden onset of thunder and lightning as "a freak thing," and prior to that "[i]t was beautiful out." (Griffin Depo., 15.)

{¶ 15} Another BCI inmate, Matthew Wilhoite, who also sustained an injury from the same lightning, described the day's weather as "sunny," "nice," and with a "little breeze." (Wilhoite Depo., 8.) Wilhoite stated the rain came "right after" the loud thunder and lightning. (Wilhoite Depo., 10.) Prior to the lightning flash that injured the inmates, Wilhoite said he did not have any concerns or fear for his safety "[b]ecause it was -- it was pretty sunny out there." (Wilhoite Depo., 11.) In explaining that the storm came "out of nowhere," Wilhoite explained "one minute it was nice out, then the next minute it just like rolled in real fast and it was -- it was there." (Wilhoite Depo., 12.) It is from the video of the recreation yard coupled with the testimony of inmates Griffin and Wilhoite that the magistrate, and subsequently the trial court, concluded the storm was fast-moving and the lightning strike was, thus, an act of God. For that reason, the trial court concluded appellee did not breach a duty of care to the inmates when it did not close the recreation yard prior to the fatal lightning strike.

{¶ 16} Appellants assert on appeal that the trial court erred in reaching this conclusion because there was ample other evidence that would support the conclusion that the storm was slow-moving. Appellants first point to the testimony of four other inmates that the storm did not develop suddenly. Inmate William Rotan testified he saw lightning in the distance for 35 or 40 minutes and that he watched "the storm rolling in from a distance." (Rotan Depo., 8, 12.) Eric Lieser stated "winds were picking up a little bit and the sky was slowly darkening." (Lieser Depo., 12.) Corey Woodruff testified there were dark, threatening clouds overhead approximately 20 minutes before Anderson was struck by lightning, and that he heard thunder approximately 10 minutes prior to the fatal lightning strike. (Woodruff Depo., 12-13.) Finally, inmate Joshua Thompson stated that

prior to the fatal strike, "off in the distance it looked like" it could storm.  (Thompson Depo., 9.)

{¶ 17} Though appellants are correct that there is competing evidence in the record, it is for the trier of fact to weigh the credibility of the evidence and determine how much weight to accord the evidence in reaching factual conclusions.  *Nott* at ¶ 9, citing *Ciccarelli v. Miller*, 7th Dist. No. 03 MA 60, 2004-Ohio-5123, ¶ 35.  As the magistrate noted, although some inmates testified the storm was slow-moving, they all also stated they were surprised by how suddenly the storm appeared overhead.  For instance, while Woodruff testified there were dark clouds overhead, he also stated he did not have any fear or concern for his own safety because he "didn't think it was going to storm" since "[i]t didn't look like it was coming our way."  (Woodruff Depo., 43.)  Further, Woodruff stated that while he thought the thunder started off in distance 10 to 20 minutes prior to the fatal lightning strike, that timeframe was "a guess."  (Woodruff Depo., 44.)  Similarly, Thompson also stated "it was a beautiful day, warm, sunny.  Then pretty much out of nowhere it started downpouring."  (Thompson Depo., 7-8.)  Thompson further stated "nobody out there thought it was going to storm I don't think" and that the storm caught everyone off guard.  (Thompson Depo., 11.)

{¶ 18} The magistrate concluded from the surveillance video of the recreation yard and the testimony of some witnesses that the storm appeared suddenly.  Thus, the magistrate concluded that, based on the totality of the evidence, appellee's employees could not have reasonably foreseen or anticipated the sudden storm and lightning strike.  Accordingly, the magistrate concluded "[appellee] had no duty to close the yard and that the injuries caused by the lightning strike are solely attributable to an [a]ct of God," and the trial court agreed with that conclusion.  (Magistrate's Decision, 8.)  Given the record before us, there was competent, credible evidence to support the trial court's conclusion that the storm developed suddenly and the lightning strike was an act of God.

### B. Expert Witness

{¶ 19} Appellants additionally argue the trial court erred in determining the storm was fast-moving because this conclusion was in direct contradiction to the opinion of

appellants' expert witness, Jeffrey Rogers, Ph.D., the climatologist for the state of Ohio. According to appellants, because Dr. Rogers' testimony was uncontroverted, the trial court erred when it did not rely on it.

{¶ 20} In determining the lightning strike was an act of God, the magistrate concluded that appellee's employees "could not have reasonably anticipated or foreseen the sudden storm which produced the fatal lightning," and that the accident was due directly and exclusively to such an act of God. (Magistrate's Decision, 8.) Appellants argue, however, that their expert witness presented uncontroverted testimony that the storm was slow-moving, and the magistrate did not sufficiently explain why it was not relying on Dr. Rogers' testimony.

{¶ 21} Dr. Rogers testified that he reviewed five radar scan images obtained from the National Weather Service showing the path of the storm from May 31, 2010 covering the time period of 6:00 p.m. to 6:30 p.m. The fatal lightning strike occurred at approximately 6:20 p.m. According to Dr. Rogers, the storm moved in a northeasterly direction over BCI at approximately 20 miles per hour, which Dr. Rogers characterized as a "relatively slow[-]moving" storm. (May 7, 2013 Tr. 302.) Dr. Rogers further testified the storm clouds produced visible lightning and audible thunder that could have been detected by BCI staff prior to the fatal lightning strike. Specifically, Dr. Rogers testified there were eight lightning strikes that would have been visible at BCI as the storm approached from 6:06 p.m. to 6:20 p.m. Further, Dr. Rogers opined, based on the radar scans, that the sky "should have been very dark for several minutes" before the fatal lightning strike and that heavy rain "would have been falling probably at least two minutes prior to the fatal lightning strike." (May 7, 2013 Tr. 320, 321.)

{¶ 22} Although appellee did not present a weather expert to contradict Dr. Rogers, the trial court relied on the testimony of other inmates at BCI who witnessed the storm and lightning strike as well as the surveillance video recording of the recreation yard from the day of the storm. Thus, while appellants' expert witness offered expert testimony that was "uncontroverted" by another expert opinion, it was not completely uncontroverted testimony as other evidence in the record supported a different conclusion than that posited by Dr. Rogers.

{¶ 23} Even if Dr. Rogers' testimony constituted "uncontroverted" expert testimony that the storm was slow-moving in that no other expert witness testified on this issue, "it is well-settled that 'triers of fact are not required to accept evidence simply because it is uncontroverted, unimpeached, or unchallenged.' " *Argie v. Three Little Pigs, Ltd.*, 10th Dist. No. 11AP-437, 2012-Ohio-667, ¶ 18, quoting *Smith v. Simkanin*, 5th Dist. No. 2011 CA 00045, 2011-Ohio-6123, ¶ 32, citing *Ace Steel Baling, Inc. v. Porterfield*, 19 Ohio St.2d 137, 138 (1969). This same rule applies to expert testimony. *State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, ¶ 71 (stating "[a] trial court is not required to automatically accept expert opinions offered from the witness stand"), citing *State v. Dickerson*, 45 Ohio St.3d 206, 210 (1989). "Nevertheless, expert opinion 'may not be *arbitrarily* ignored, and some reason must be objectively present for ignoring expert opinion testimony.' " (Emphasis sic). *Id.*, quoting *United States v. Hall*, 583 F.2d 1288, 1294 (5th Cir.1978). A plaintiff bears the burden of persuasion on all dispositive issues, and " ' "[a]s long as there are objectively discernable reasons why the [finder of fact] may have rejected the expert" ' " testimony, the decision may withstand challenge on appeal. *Argie* at ¶ 18, quoting *Welch v. Ameritech Credit Corp.*, 10th Dist. No. 04AP-1123, 2006-Ohio-2528, ¶ 13, quoting *Dottavio v. Shepherd*, 9th Dist. No. 98CA0042 (Dec. 1, 1999).

{¶ 24} As outlined above, there were several objectively reasonable, discernable reasons why the trial court may have rejected the expert's testimony. While the magistrate noted Dr. Rogers' conclusion that "the sky over BCI would have darkened noticeably several minutes prior to the fatal lightning strike and that heavy rain would have fallen for at least two minutes before the incident," the magistrate expressly stated that the video of the recreation yard corroborates the testimony of other witnesses "that the storm appeared suddenly." (Magistrate's Decision, 7-8.) The trial court similarly noted that several witnesses indicated the storm developed suddenly and further noted there is no dispute as to the authenticity of the video recording of the recreation yard. Thus, the trial court did not arbitrarily ignore the expert opinion of appellants' climatologist when it relied on other evidence in the record to conclude the storm appeared suddenly and, thus, was an act of God.

**C. Affirmative Duty**

{¶ 25} Appellants further argue the trial court's conclusion that appellee did not breach a duty of care was erroneous because it improperly allocated an affirmative duty to the inmates to remove themselves from harm. The trial court noted in its judgment entry that appellants "offered no explanation as to why the inmates remained in the yard and watched the approaching storm when they were free to return to the dormitory building." (Oct. 31, 2013 Judgment Entry, 3.) From this statement, appellants argue the trial court created an affirmative duty for the inmates to act to protect their own safety.

{¶ 26} This argument misconstrues the trial court's judgment entry. When read in context, it is clear that the trial court did not create an affirmative duty on the part of the inmates; rather, the trial court noted the fact that the inmates did not seek shelter from the supposedly slow-moving storm discredits appellants' argument that the storm was slow-moving. Instead, the trial court noted the inmates continued presence in the yard until the moment of the lightning strike supports appellee's position that the storm developed suddenly and without warning. Accordingly, this argument lacks merit.

{¶ 27} Based on the foregoing, the trial court's judgment was not against the manifest weight of the evidence as competent, credible evidence supported the trial court's conclusion that the storm was fast-moving and the lightning strike was an act of God. The trial court did not err in disregarding appellants' expert witness, nor did the trial court improperly allocate an affirmative duty to the inmates. Thus, we overrule appellants' first, second, and third assignments of error.

## IV. Fourth Assignment of Error – Post Orders

{¶ 28} In their fourth and final assignment of error, appellants argue the trial court erred as a matter of law in determining appellee's post orders were mere guidelines and did not confer rights on inmates. More specifically, appellants assert the corrections officer assigned to the recreation yard at the time of the fatal lightning strike "breached his duty of care when he entered the education building without authorization, exposing the inmates to danger that proved to be fatal." (Appellants' brief, 55.)

{¶ 29} The post orders for BCI were issued by the warden and were intended to "set forth proper security procedures to assure the safety and security of inmates, staff and visitors," as well as to "describe proper security procedures for the control and supervision of inmate activity in various work, school, recreation, program, and other

activity areas." (Plaintiff's exhibit No. 6, 1.) The post orders instructed the yard officer on duty to conduct 30-minute security checks of the education building. Further, the post orders state that any access to the education building "after hours must be for security reasons and require the notification of a shift supervisor." (Plaintiff's exhibit No. 6, 4.) On the evening of May 31, 2010, Officer Michael Remenar was assigned to yard duty. During his shift, he entered the education building without notifying a shift supervisor even though the education building was closed for the Memorial Day holiday. Officer Remenar was still in the education building when the lightning strike occurred. Appellants assert this violation of the post orders is sufficient to establish appellee, through its employees, breached a duty of care owed to the inmates at BCI.

{¶ 30} The trial court construed the post orders as an internal policy, and we agree. In general, neither a breach of internal regulations by a corrections officer nor a corrections officer's internal discipline for his or her conduct, without more, constitute negligence or automatically lead to a finding of negligence. *Horton v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 05AP-198, 2005-Ohio-4785, ¶ 29. Further, "[a] violation of an internal policy does not establish the standard of care." *Marsh v. Heartland Behavioral Health Ctr.*, 10th Dist. No. 09AP-630, 2010-Ohio-1380, ¶ 35, citing *Vince v. Canton*, 5th Dist. No. 1997CA00299 (Apr. 13, 1998). While the post orders can be used as evidence to establish what the standard of care is, they are not, in and of themselves, conclusive proof of a specific duty, nor is a deviation from the post orders, in and of itself, a breach of a duty of care.

{¶ 31} Here, the unique factual circumstances of the development of the storm as well as the language of the post orders all support the trial court's conclusion that appellee was not negligent in failing to close the recreation yard. While the post orders purport to require the officers to supervise the inmates at all times, those same post orders do not require the yard officer to be present in the yard for every moment of recreation time. For example, the post orders also state the yard officer will escort the inmate assigned to trash detail to trash dumpsites during the recreation period. Additionally, the post orders instruct the yard officer to make various safety checks of other areas of the BCI compound away from the yard during recreation hours. Even by the post orders' own terms, the yard officer will not always be outside in the recreation yard with the inmates. Appellee's

expert witness on prison security, Timothy Gravette, also testified that Officer Remenar's presence in the education building was not dispositive on the issue of the standard of care, nor was it necessary for a relief officer to monitor the yard while the duty officer was away from the yard.  Where the yard officer can be away from the yard during recreation hours yet still be in total compliance with the post orders, we are not persuaded that the terms of the post orders created a heightened duty.

{¶ 32} As we have already stated, appellee owed its inmates the common law duty of reasonable care and protection from unreasonable risks.  Based on the evidence before us, it is not clear what, if any, difference it would have made if Officer Remenar had been outside in the minutes leading up to the lightning strike.  By the accounts of most witnesses, the first visible lightning was the fatal bolt that struck Anderson and injured Mastaso, and the staff at BCI immediately closed the recreation yard after witnessing that lightning.  Given the other evidence at trial supporting the conclusion that the storm appeared suddenly, appellants cannot establish Officer Remenar breached a duty of care simply by being inside the education building and the trial court did not err in reaching this conclusion.  Accordingly, we overrule appellants' fourth and final assignment of error.

## V. Disposition

{¶ 33} Based on the foregoing, the trial court did not err in determining appellee was not negligent in failing to close the recreation yard the day of the fatal lightning strike. Having overruled appellants' four assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

BROWN and O'GRADY, JJ., concur.

———————————