OPINION
{¶ 1} Plaintiff-appellant, Linda M. Rahman, individually, and as administrator of the estate of Syed Rahman, deceased, appeals the April 19, 2005 judgment of the Ohio Court of Claims in favor of defendant-appellee, Ohio Department of Transportation ("ODOT".)
 {¶ 2} State Route ("SR") 18 is a four-lane, divided highway in Summit County, Ohio. Prior to 1997, an 18-foot wide median separated the eastbound and westbound lanes of SR 18. The median included a 14-foot wide section of grass, sloped to create a v-shape in the center. In 1997, ODOT commenced a roadway project on SR 18 during which ODOT widened and paved the shoulders adjacent to the traveled portions of the roadway, widened each of the four travel lanes, and added paved turn lanes. ODOT's original design specifications retained the v-sloped grass median; however, the addition of turn lanes and the widening of the shoulder and travel lanes resulted in the narrowing of the grass portion of the median to six feet. Drainage calculations were performed and the drainage system was deemed to be adequate.
 {¶ 3} Midway through the project, ODOT Construction Manager, John Avery, submitted a request to ODOT District 4 Deputy Director, David R. Dreger, to eliminate the grass median due to concerns that the narrow median could not be safely mowed. Following consultation with the project's engineering team, Dreger authorized a change order to remove the existing grass, pave the remainder of the median, and fill in the v-shaped contour with asphalt grindings. This modification altered the slope of the median, rendering it relatively flat.
 {¶ 4} At the time of the ODOT project, Walter Markowski was the Police Chief of Copley, Ohio, as well as a Copley Township Trustee. Markowski believed that the original 14-foot grass median, which he estimated to include a three-foot v-slope, served as a deterrent to cross-over accidents. Because the roadway project eliminated the grass median, Markowski thought ODOT should install a guardrail between the eastbound and westbound lanes of SR 18. Markowski believed a guardrail would prevent an errant vehicle from crossing over the paved median strip by redirecting the vehicle to its proper travel lane, or, at the very least, slow down a vehicle that breached the guardrail, thus giving the driver of a vehicle traveling in the opposite direction more time to react and avoid a collision.
 {¶ 5} Markowski discussed his concerns with the other township trustees and various law enforcement personnel. As a result of those discussions, the township trustees, on November 26, 1997, wrote to Dreger requesting the placement of a guardrail in the median. The trustees asserted that ODOT's decision to pave the median "present[ed] a danger to motorists, especially [when] * * * approaching * * * [and] raised a concern with safety chiefs from Bath, Fairlawn and Copley stating that a paved median could create head-on collisions. They refer to it as a `suicide lane.'" (Plaintiff's Exhibit 3.)
 {¶ 6} Following receipt of the letter, Dreger consulted with members of the project engineering team. Following these discussions, Dreger informed the trustees by letter of December 3, 1997, that ODOT had decided not to install a guardrail in the median. ODOT completed the roadway project in the spring of 1998 without constructing a guardrail.
 {¶ 7} On June 28, 1998, Syed Rahman was driving eastbound on SR 18 during a heavy rainstorm; plaintiff, Syed's wife, was riding in the passenger seat. The speed limit in the area was 45 miles per hour. The roadway was wet, but according to plaintiff, Syed had no trouble controlling his car (i.e., it was not slipping or sliding) because he was "being very cautious" * * * [and had his] "[e]yes on the road." (Vol. I, 44.) Without warning, a sport utility vehicle driven by Gary Baker crossed the median and struck plaintiff's car. The collision killed Syed and seriously injured plaintiff.
 {¶ 8} In June 1999, ODOT initiated a change order regarding the SR 18 project. The order stated, in relevant part:
AN EMERGENCY HAS BEEN DECLARED AND APPROVED. * * * AFTER THE COMPLETION OF WORK ON THIS PROJECT, BUT PRIOR TO FINALING [SIC], IT WAS DISCOVERED THAT THE IMPROVEMENTS MADE TO THIS SECTION OF SR 18 INCREASED THE SHEET FLOW OF WATER ON THE PAVEMENT SURFACE. THIS OVERWHELMS THE DETERIORATED EXISTING DRAINAGE SYSTEM CAUSING WHAT COULD BE CONSIDERED A POTENTIALLY DANGEROUS SITUATION DURING PERIODS OF HEAVY RAIN. * * *
(Plaintiff's Exhibit 5B.)
 {¶ 9} On March 28, 2002, appellant filed a complaint against ODOT,[1] alleging that in the design and implementation of the roadway project, ODOT negligently failed to provide for adequate drainage in both the roadway and the median area. (Complaint, ¶ 3.) Appellant also alleged that, in addition to the negligent design and implementation of the roadway project, in contravention of their duty to provide the public with safe roadways, ODOT negligently failed to maintain the existing drainage structures before, during, and after the roadway project. (Complaint, ¶ 4.) Appellant asserted that as a direct and proximate result of ODOT's negligence, the roadway and median were unsafe for the traveling public. (Complaint, ¶ 5.) The trial court bifurcated the issues of liability and damages; the issue of liability was tried to the court over two days in October 2004.
 {¶ 10} At trial, Trooper Terry Heard, of the Ohio State Highway Patrol, testified that it was raining heavily when he arrived at the accident scene. According to Heard, Baker reported that he was traveling 45 to 50 miles per hour when he lost control of his vehicle after he "hydroplane[d] and hit uneven pavement." (Vol. I, 109.) As part of his investigation, Heard inspected the area of the roadway where Baker claimed to have hydroplaned; he noted that "there was a lot of water accumulated on the road." (Vol. 1, 117.) He further testified that there was "a lot of standing water, which would make it very believable that [Baker] hydroplaned." (Vol. 1, 118.) From his investigation, he concluded that "hydroplaning due to water on the roadway was the cause of Mr. Baker losing control." (Vol. 1, 128.) He further concluded that a guardrail in the median "would have changed the outcome of the crash." (Vol. 1, 119.)
 {¶ 11} On cross-examination, Heard acknowledged that at the time of the accident, Baker was nearing the bottom of a long downward grade on SR 18. He also testified that he did not observe water backing up out of the median and did not notice any standing, pooling or ponding water on the roadway in the vicinity of the accident scene. Rather, he stated that "there was just a sheet of water across * * * both lanes of traffic." (Vol. I, 124.) As to his opinion that a guardrail would have changed the outcome of the accident, Heard acknowledged that he did not perform an accident reconstruction, and had no experience in the design, construction, or testing of guardrails.
 {¶ 12} Dreger characterized the roadway project as a resurfacing and widening project, not a redesign or reconstruction project. He acknowledged, however, that the project changed the width, grade and surface of the median. He also acknowledged that these changes increased the likelihood of a vehicle crossing over the median. He denied, however, that a grass median was more likely to permit drainage than the asphalt grindings; indeed, he insisted that the asphalt grindings were absorbent, inasmuch as they were loosely packed and placed over a dirt surface. He further stated that the median was still depressed enough for water to channel from the roadway into it.
 {¶ 13} Dreger acknowledged that the 1999 change order was initiated to correct problems with surface water reentering the roadway from the median in the area where the accident occurred. He also acknowledged that ODOT had no problems with water drainage on SR 18 prior to the roadway project, and that the project created the water drainage problems. Dreger further acknowledged that ODOT was responsible for designing the roadway and drainage system to ensure that water was properly drained from the roadway even during periods of heavy rain.
 {¶ 14} Plaintiff's expert, Carmen Daecher, an accident reconstructionist, testified that the 1997 roadway project reduced the drainage capacity of the median when ODOT eliminated two-thirds of the drainage area. He also stated that ODOT increased the sheet flow of water on the roadway by removing the grass and decreasing the amount of porous surface. Daecher opined that Baker hydroplaned due to water accumulated on the roadway from the heavy rain; he then lost control of his vehicle and spun sideways across the median into plaintiff's vehicle. Daecher based his opinion on the dynamics of the accident, the general path of the vehicles prior to impact, the orientation of the vehicles at the moment of impact, the damage depicted in photographs, the police report, and the final resting place of the vehicles relative to each other.
 {¶ 15} Daecher opined that the drainage system was inadequate to handle the rainwater, and that ODOT should have reevaluated the drainage system and its capacity to accommodate the increased burden. He acknowledged, however, that he did not perform any calculations to quantify either the increased sheet flow of water on the roadway or the median's reduced capacity for drainage.
 {¶ 16} Daecher also opined that the ODOT project was not merely a maintenance project; rather it was a construction/improvement project. Daecher based this opinion on the fact that the lanes were widened, turn lanes were added, and the median was reconfigured. Thus, according to Daecher, ODOT was required to upgrade the median to include a guardrail. In support of this opinion, Daecher referenced Section 601.3 and Figure 601-4 of ODOT's Location and Design Manual ("LDM").
 {¶ 17} Daecher testified that a 27-inch high, double-faced, single-post guardrail would be the most appropriate choice for SR 18. Daecher opined that such a guardrail would not obstruct the sight distance of motorists either approaching or traveling on SR 18. Daecher further opined that ODOT could have safely employed impact attenuators to eliminate potential problems with guardrail truncations at crossovers, driveways, and intersections. Daecher further opined that a guardrail on SR 18 would have prevented the accident. However, on cross-examination, Daecher admitted that he had not done an accident reconstruction to determine either the speed, force or angle at which Baker's vehicle would have hit the guardrail had one been in place.
 {¶ 18} ODOT's expert, Kathleen King, a Geometrics Engineer with ODOT, testified that the SR 18 resurfacing project was rehabilitative and did not rise to the level of reconstruction. She opined that ODOT did not violate reasonable engineering practices by reconfiguring the median without erecting a guardrail. She further stated that no regulations, including the LDM, mandated a guardrail in the median; rather, such a decision is left to ODOT's discretion.
 {¶ 19} On April 19, 2005, the court issued a written decision in favor of ODOT. The court determined that plaintiff's negligence claim also encompassed an allegation that ODOT created a qualified nuisance, and that under a claim of qualified nuisance, the allegations of nuisance and negligence merge to become a negligence action.
 {¶ 20} The court noted that ODOT, while not an insurer of the safety of its highways, has a duty to maintain its highways in a reasonably safe condition for the motoring public. The court found that ODOT acted reasonably when it removed the grass and reconfigured the median. In so finding, the court rejected plaintiff's evidence suggesting that grassy terrain acts as a deterrent to errant vehicles; the court also noted that none of the witnesses testified as to the precise depth or dimensions of the v-shaped slope as it existed prior to the resurfacing project.
 {¶ 21} The court also found that the roadway project was a maintenance project rather than a construction project; as such, the court determined that ODOT had no duty to upgrade the roadway to include a guardrail. The court further found that ODOT presented sufficient credible evidence to support its argument that installation of a guardrail posed a safety hazard.
 {¶ 22} The court also noted that to prove a breach of a duty to maintain the roadway, plaintiff was required to demonstrate that ODOT had actual or constructive notice of the exact condition or defect alleged to have caused the accident. The court found that plaintiff failed in this regard, as she did not establish that ODOT received complaints or warnings of high water or ponding during heavy rains in the vicinity of the accident prior to the collision.
 {¶ 23} The court also found that plaintiff failed to establish that rainwater accumulated in the area of the accident or that rainwater contributed to Baker's loss of control. The court further found that plaintiff failed to prove by a preponderance of the evidence that ODOT negligently designed or maintained a dangerous condition in the vicinity of the accident.
 {¶ 24} Finally, the trial court found that Baker was operating his vehicle at a speed greater than permitted him to operate his vehicle safely and that his negligence was the sole proximate cause of the accident.
 {¶ 25} The court confirmed its decision in a judgment entry filed the same day. Appellant has timely appealed, setting forth the following two assignments of error:
I. THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY HOLDING THAT THE STATE'S DUTY TO PROTECT THE MOTORING PUBLIC DID NOT APPLY TO "MAINTENANCE" PROJECTS.
II. THE TRIAL JUDGE'S VERDICT FOR THE STATE WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 26} By the first assignment of error, plaintiff essentially contends that the trial court improperly defined the scope of ODOT's duty of care. More particularly, plaintiff argues that the trial court assigned a "watered-down" duty of care on grounds that the SR 18 roadway project constituted a "maintenance" operation.
 {¶ 27} As noted, the trial court concluded that plaintiff's negligence claim also encompassed an allegation that ODOT created a qualified nuisance. This court, in Hurier v. Ohio Dept. ofTransp., Franklin App. No. 01AP-1362, 2002-Ohio-4499, discussed a claim of qualified nuisance, stating:
* * * A qualified nuisance is premised upon negligence. To recover damages for a qualified nuisance, negligence must be averred and proven. * * * A qualified nuisance is a lawful act "so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." * * * Under such circumstances, the nuisance arises from a failure to exercise due care. * * * Thus, the allegations of nuisance and negligence therefore merge, as the nuisance claims rely upon a finding of negligence. (Citations omitted.)
Id. at ¶ 21.
 {¶ 28} To prove actionable negligence, plaintiff must prove by a preponderance of evidence that ODOT owed a duty of care, that ODOT breached that duty, and that plaintiff suffered damages as a proximate result thereof. Lunar v. Ohio Dept. of Trans.
(1989), 61 Ohio App.3d 143, 147, 572 N.E.2d 208, citing Strotherv. Hutchinson (1981), 67 Ohio St.2d 282, 21 O.O.3d 177,423 N.E.2d 467.
 {¶ 29} "Pursuant to R.C. 5501.11, ODOT has the responsibility to construct and maintain highways in a safe and reasonable manner." Rhodus v. Ohio Dept. of Transp. (1990),67 Ohio App.3d 723, 729 588 N.E.2d 864. See, also, White v. Ohio Dept. ofTransp. (1990), 56 Ohio St. 3d 39, 42, 564 N.E.2d 462; Knickelv. Dept. of Transp. (1976), 49 Ohio App.2d 335, 339,361 N.E.2d 486. "This duty encompasses a duty to exercise reasonable care in conducting its roadside maintenance or construction activities to protect * * * from the hazards arising out of these activities."McFadden v. Ohio Dept. of Transp., 129 Ohio Misc.2d 1, 3,2004-Ohio-3756, 8 N.E.2d 581. However, ODOT is not an insurer of the safety of its roadways. Knickel, supra. Further, it is settled that ODOT has no duty to upgrade highways to current design standards when acting in the course of maintenance.Wiebelt v. Ohio Dept. of Transp. (June 24, 1993), Franklin App. No. 93AP-117, citing Lunar, supra. Maintenance involves only the preservation of existing highway facilities, rather than the initiation of substantial improvements. Wiebelt, supra.
 {¶ 30} Plaintiff suggests that the court's determination that the roadway project constituted a "maintenance" rather than a "construction" operation resulted in the court holding ODOT to a lesser standard of care than that imposed by R.C. 5501.11 and the common law. We disagree. Initially, we note that, contrary to plaintiff's contention, the trial court's characterization of the project as a "maintenance" operation is supported by the evidence. Dreger described the project as a resurfacing and widening project, not a redesign or reconstruction operation. ODOT's expert, King, characterized the project as "rehabilitative," stating that it did not rise to the level of "reconstruction."
 {¶ 31} Further, there is no language in the trial court's decision which indicates that it applied an improper or "watered down" standard of care in determining whether ODOT was negligent in maintaining SR 18. Indeed, the court recited and imposed the precise standard of care set forth above: "ODOT has a duty to maintain its highways in a reasonably safe condition for the motoring public." (April 19, 2005 Decision, 8.) The court's reference to the project as a "maintenance" project related only to its determination that ODOT did not have a duty to upgrade SR 18 roadway to current design standards, i.e., to install a guardrail in the median where none existed prior to commencement of the project. Contrary to plaintiff's contention, the court did not assign a lesser standard of care based upon its characterization of the project as a "maintenance" operation. The first assignment of error is overruled.
 {¶ 32} Having clarified the scope of ODOT's duty of care to maintain reasonably safe highways, we turn to plaintiff's second assignment of error, in which she contends that the trial court's judgment is against the manifest weight of the evidence.
 {¶ 33} In determining whether a trial court's judgment is against the manifest weight of the evidence, a reviewing court must be guided by the presumption that the findings of the trial court are correct, as the trial court "* * * is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal v.Cleveland (1984), 10 Ohio St.3d 77, 80, 10 OBR 408,461 N.E.2d 1273. In C.E. Morris Co. v. Foley Const. Co. (1978),54 Ohio St.2d 279, the Supreme Court of Ohio held that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. Id. at syllabus. In applying this standard, the court has stated that if the evidence is susceptible of more than one construction, it must be given that interpretation, consistent with the verdict and judgment, which is most favorable to sustaining the trial court's verdict and judgment. See Karchesv. Cincinnati (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350.
 {¶ 34} Plaintiff first challenges the trial court's determination that ODOT acted reasonably, i.e., did not create a defect or dangerous condition, when it eliminated the v-sloped grassy ditch, replaced it with asphalt grindings, and paved the remainder of the median. Plaintiff contends that the greater weight of the evidence establishes that the reconfiguration of the median substantially reduced the roadway's drainage capacity, which caused water to accumulate on the roadway during periods of heavy rain, and that such an accumulation of rainwater existed at the time of the accident, causing Baker to hydroplane and lose control of his vehicle. In support of her contention, plaintiff relies on Daecher's assertions that the ODOT project reduced the drainage capacity of the median, rendering it inadequate to accommodate the increased burden caused by the heavy rainfall that preceded the accident, and that Baker lost control of his vehicle when he hydroplaned on water accumulated on the roadway. Plaintiff contends Daecher's opinions were verified by Heard's observations that there was significant standing water on the roadway where the accident occurred. Plaintiff further cites Dreger's acknowledgement that the 1999 change order was initiated to correct problems with surface water reentering the roadway from the median in the area where the accident occurred, as well as his admission that ODOT experienced problems with water drainage only after the median was reconfigured.
 {¶ 35} We note, however, that Daecher admitted that he did not perform any calculations to quantify either the drainage capacity of the reconfigured median or the corresponding increased sheet flow of water on the roadway. We further note that although Heard testified on direct examination that his inspection of the area where Baker claimed to have hydroplaned revealed standing water on the roadway, he stated on cross-examination that he did not observe water backing up out of the median and did not notice any standing, pooling or ponding water in the area of the accident. We further note that Dreger denied that the median reconfiguration negatively affected the flow of water on the roadway, as the asphalt grindings provided adequate absorption and enough slope remained to permit water to channel from the roadway into the median. Finally, we note that plaintiff's evidence regarding the 1999 change order does not expressly establish that there was standing water on the roadway at the time of the accident.
 {¶ 36} We find that the trial court's decision that ODOT did not create a defect or dangerous condition when it reconfigured the median without modifying the drainage system was not against the manifest weight of the evidence. The relative weight to be given witness testimony, including that of an expert, and the credibility to be afforded each of the witnesses was a question for the trier of fact. Basilone v. Ohio Dept. of Transp. (Feb. 13, 2001), Franklin App. No. 00AP-811. Thus, the trial court was free to believe all, part, or none of the testimony of each of the witnesses who appeared before it. Id. Further, "credible evidence in favor of the party for whom the judgment was granted must be considered as controlling for the purposes of * * * an assertion that the finding of the trial court was against the manifest weight of the evidence." McClellan v. Ohio Dept. ofTransp. (1986), 34 Ohio App.3d 247, 249 517 N.E.2d 1388. Because the trial court could properly discount Daecher's testimony and find Heard's cross-examination testimony and Dreger's testimony to be credible and persuasive, plaintiff failed to establish that reconfiguration of the median without replacing the drainage system constituted a defect or dangerous condition. Having determined that the reconfiguration of the median did not constitute a nuisance or hazardous condition, we need not address plaintiff's challenge to the trial court's finding that ODOT did not have notice of the hazardous condition.
 {¶ 37} Plaintiff also challenges the trial court's finding that ODOT was not negligent in failing to erect a guardrail between the eastbound and westbound lanes of SR 18 following reconfiguration of the median. Plaintiff posits that the plain language of Section 601.3 and Figure 601-4 and the inherent danger of head-on collisions on a four-lane, divided highway with only a six-foot paved median require that Section 601.3 and Figure 601-4 be construed to mandate the use of a guardrail.
 {¶ 38} R.C. 4511.09 requires that ODOT adopt a manual and specifications for a uniform system of traffic control devices. To comply with that mandate, ODOT adopted the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), which sets forth standards for the installation and maintenance of traffic control devices. Winwood v. Dayton (1988), 37 Ohio St.3d 282, 284,525 N.E.2d 808. ODOT also developed the LDM, which establishes policies and standards to follow when designing and maintaining highways in a reasonably safe condition. Yinger v. Ohio Dept. ofTransp. (1992), 66 Ohio Misc.2d 69, 72, 643 N.E.2d 180.
 {¶ 39} In Reynolds v. State (1984), 14 Ohio St.3d 68,471 N.E.2d 776, paragraph one of the syllabus, the Ohio Supreme Court held:
The language in R.C. 2743.02 that "the state" shall "have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *" means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities.
 {¶ 40} In Winwood, supra, the Ohio Supreme Court concluded that the decision to install or to forgo a traffic control device constitutes a planning function involving basic policy decisions and the exercise of a high degree of official discretion which immunizes a municipality from tort liability. In support of its conclusion, the court cited the Section 1C of the OMUTCD, which provides in pertinent part that:
The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the Manual is not a substitute for engineering judgment. Except for sections of this Manual that mandate the installation of a traffic control device, it is the intent that the provisions of this Manual be standards for traffic control device installation, but not a requirement for installation. Qualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices, just as they are needed to locate and design the roads and streets which the devices complement.
Id.
 {¶ 41} The court held the city could not be held liable for a decision not to install a traffic signal at an intersection since such a decision was a discretionary government function. Id. However, in a footnote, the court noted that there existed "* * * no evidence in the record that any traffic control device was mandated by the manual at the intersection in question." Id. at 285. Implicit in this statement is the belief that had the court been presented with evidence that a traffic control device was mandated by the manual, the court's decision may have been different. See Perkins v. Ohio Dept. of Transp. (1989),65 Ohio App.3d 487, 492, 584 N.E.2d 794; Pottenger v. Ohio Dept. ofTransp. (Dec. 7, 1989), Franklin App. No 88AP-832.
 {¶ 42} Section 601.3 of the LDM provides:
A median barrier is a longitudinal barrier used to separate opposing traffic on a divided highway. It is used only if striking the barrier is less severe than the consequences had no barrier existed. Figure 601-4 may be used to determine the need for median barriers. * * *
The introduction of median barriers may have an adverse effect on both horizontal and intersection sight distances. These should be further investigated when barriers are used in the median.
(Plaintiff's Exhibit 7A.)
 {¶ 43} Plaintiff's expert, Daecher, opined that in the instant matter, the consequences would have been less severe had Baker collided with the guardrail rather than cross over the median into oncoming traffic. Thus, according to Daecher, ODOT should have used Figure 601-4 to determine whether or not a guardrail was warranted.
 {¶ 44} Figure 601-4 depicts a grid plotting the use of guardrails as either optional or warranted based upon the width of the median and the traffic volume on opposing roadways where the speed limit is over 40 mph. (Plaintiff's Exhibit 7B.) Daecher plotted the median width and traffic volume on SR 18 in the warranted portion of the grid; thus, according to Daecher, ODOT was required to erect a guardrail unless extenuating circumstances existed to countermand that requirement. Daecher opined that no such extenuating circumstances existed to justify the failure to erect a guardrail.
 {¶ 45} In contrast, ODOT's expert, King, testified that the LDM did not require ODOT to install a guardrail in the median. More particularly, King averred that the word "may" in Section 601.3 means that ODOT is not required to use Figure 601-4 in determining the need for a guardrail. King further testified that even if ODOT chose to utilize Figure 601-4, a plot point falling inside the "warranted" portion of the grid allows ODOT discretion to determine whether or not to install a guardrail.
 {¶ 46} Plaintiff argues that King's interpretation of Figure 601-4, i.e., that "warranted" really means "optional," renders the grid superfluous, and that Daecher's interpretation is correct. Because the trial court could properly find the testimony of ODOT's expert to be credible and persuasive, plaintiff failed to establish that the LDM required ODOT to install a guardrail in the median.
 {¶ 47} Because installation of a guardrail was not mandated by the LDM, the decision was one left to the engineering discretion of ODOT. Here, according to Dreger, the engineering team discussed the problem of multiple crossovers on SR 18 and concluded that multiple short runs of guardrail could pose a safety hazard. In addition, King testified that ODOT did not violate reasonable engineering practices in reconfiguring the median without installing a guardrail. King further stated that the placement of a guardrail in the median would create a hazard to motorists attempting left-hand turns into driveways and intersections because the guardrail would obstruct the view of oncoming traffic. She also testified that the numerous intersections and crossovers on SR 18 would require corresponding guardrail truncations, and that each truncation would have to be protected by an impact attenuator in order to reduce damage to an errant vehicle striking the truncated portion of the guardrail. King further opined that ODOT could reasonably have eliminated the median entirely and placed the eastbound and westbound lanes of SR 18 adjacent to one another, separated only by a painted yellow line. Given this evidence, we conclude that the trial court did not err in finding that ODOT's decision to forego installation of a guardrail was reasonable under the circumstances.
 {¶ 48} In short, we find that the trial court's decision that ODOT was not negligent in its maintenance of SR 18 was not against the manifest weight of the evidence. The second assignment of error is overruled.[2]
 {¶ 49} Having overruled both of plaintiff's assignments of error, we hereby affirm the judgment of the Ohio Court of Claims.
Judgment affirmed.
French and Travis, JJ., concur.
[1] In the complaint, appellants asserted identical claims against ODOT's contractor, Kenmore Construction Company, Inc. ('Kenmore"). The court sua sponte dismissed Kenmore as a party pursuant to R.C. 2743.02(E).
[2] We note that plaintiff has failed to assign as error the trial court's determination that Baker was operating his vehicle at a speed greater than permitted him to operate his vehicle safely and that his negligence was the sole proximate cause of the accident. See App.R. 16(A)(3.)