[Cite as *Estate of Morgan v. Ohio Dept. of Transp.*, 2010-Ohio-1532.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

THE ESTATE OF SHANE MORGAN

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION

    Defendant
    Case No. 2006-03991

Judge Joseph T. Clark

<u>DECISION</u>

{¶ 1} Plaintiff brought this action against defendant, Ohio Department of Transportation (ODOT), alleging negligence. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} At approximately 7:00 p.m. on June 10, 2005, Shane Morgan arrived at the home of his ex-wife, Angela, to pick up his 19-month-old daughter Marlee Grace for a scheduled visitation. Shane was driving a Toyota Corolla with both his mother, Roberta Morgan, and his father, Gary Morgan, as passengers. Marlee Grace was secured in a child's car seat located in the rear of the vehicle. Roberta was seated next to Marlee Grace and Gary was seated in the front passenger's seat.

{¶ 3} The Morgans left Angela's home, in a moderate rain, and headed to Shane's home in Manchester, Ohio, which was Gary's destination. After Gary exited the vehicle in Manchester, Roberta remained in the back seat next to Marlee Grace for the trip to Roberta's home in Aberdeen, Ohio.

{¶ 4} Three to four miles away from Roberta's home, southbound State Route (SR) 41 approaches an intersection with Ripley Pike Road. Just beyond the intersection, a creek flows through a culvert directly under SR 41 and then continues west, parallel to Ripley Pike Road. SR 41 curves slightly to the left as it crosses over the culvert.

{¶ 5} It had rained heavily earlier in the day and the creek had become swollen with rainwater which then began to flow quite rapidly through the culvert. As Shane proceeded south on SR 41 toward Ripley Pike Road, his vehicle crested a small hill and then headed down a slope toward the intersection. Shane suddenly lost control of the vehicle. The Corolla left the roadway and skidded approximately 35 feet in the grass where it crashed through a fence as it slid toward the swollen creek. According to an eyewitness, the Corolla teetered briefly on the north bank of the creek before overturning and sliding into the water.

{¶ 6} The Corolla was swept a short distance downstream by the force of the current where it became wedged in the culvert, just below the roadway. Roberta testified that she was swept out of the vehicle and into the flooded creek before she was able to free Marlee Grace from her car seat. Roberta was able to stay afloat long enough to pass through the culvert and then latch on to some debris lodged in the bank of the creek, where she was later found and rescued.

{¶ 7} Rescue personnel arrived at the scene only minutes after the Corolla plunged into the creek. Marlee Grace's lifeless body was found in the vehicle still strapped into her car seat. Efforts to revive her were unsuccessful. Shane's body was found two to three miles downstream.[1]

{¶ 8} In order for plaintiff to prevail under a theory of negligence, plaintiff must establish that ODOT owed the decedent a duty of care, that ODOT breached that duty, and that plaintiff suffered damages as a proximate result thereof. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282. ODOT has a general duty to maintain its highways in a reasonably safe condition for the traveling public. *Knickel v. Dept. of Transportation* (1976), 49 Ohio App.2d 335. However, ODOT is not an insurer of the

---

[1]The Estate of Marlee Grace Morgan filed a companion case against ODOT on June 1, 2006, Case No. 2006-03869. By entry dated April 9, 2007, the two cases were combined for trial. A separate decision has been issued in Case No. 2006-03869.

safety of its highway. See *Rhodus v. Ohio Dept. of Transp.* (1990), 67 Ohio App.3d 723.

{¶ 9} Pursuant to R.C. 5501.11(A), ODOT is responsible for establishing "state highways on existing roads, streets, and new locations and [to] construct, reconstruct, widen, resurface, *maintain, and repair* the state system of highways and the bridges and culverts thereon." (Emphasis added.) Plaintiff alleges that ODOT was negligent in failing to maintain the roadway, bridge, and culvert in a reasonably safe condition for the traveling public and that such failure proximately caused the death of Shane Morgan. For the following reasons, the court finds that plaintiff has failed to prove negligence.

{¶ 10} Plaintiff first alleges that defendant breached its duty to maintain the bridge and culvert in a reasonably safe condition for the traveling public by failing to correct the high water problem that arose during periods of heavy rainfall. As a general rule, ODOT is liable for damages caused by defects, or dangerous conditions on state highways where it has notice of the condition, either actual or constructive. *McClellan v. Ohio Dept. of Transp.* (1986), 34 Ohio App.3d 247, paragraph one of the syllabus.

{¶ 11} The weight of the evidence in this case shows that the culvert in question had, on numerous occasions since it was first constructed, become clogged with debris which, in periods of exceptional rainfall, caused water to flow out of the creek bed and onto the roadway. The evidence at trial also permits the inference that ODOT either knew or should have known of these prior occurrences. Plaintiff contends that ODOT's knowledge of the hazard created by the flooding of SR 41 gave rise to a duty on the part of ODOT to reconstruct the bridge in such a manner as to prevent flood water from spilling out onto SR 41. According to plaintiff, ODOT's failure to do so establishes a lack of due care.

{¶ 12} In *McClellan*, supra, plaintiff lost control of her vehicle when she encountered high water that had collected in a slight swale adjacent to a roadside culvert. She suffered personal injuries when her vehicle left the roadway and overturned. The trial court granted ODOT's motion for summary judgment due to plaintiff's failure to present any evidence that ODOT had either actual or constructive notice of the hazard. The court of appeals affirmed the trial court. In so doing, the court of appeals noted that, if ODOT had either actual or constructive notice of the hazard,

then ODOT would have had a duty "to do something about it, such as signs warning of high water, increasing the size of the ditch or the culvert, or reducing the growth of vegetation." Id. at 249. Thus, while the court determined that ODOT's maintenance duties required it to address hazardous high water problems upon receiving notice of such problems, the court was careful not to impose a duty upon ODOT to reconstruct the highway in order to eliminate the problem.

{¶ 13} In this case, the evidence shows that ODOT had notice that, from time to time during periods of heavy rain, high water flooded SR 41 in the area where the accident occurred. The evidence also shows that Shane was familiar with this particular stretch of SR 41 inasmuch as it was the most direct route between Angela's home and his mother's home. Robert Osmon, ODOT's Adams County manager, testified that a "high water" warning sign was located on SR 41 in advance of the intersection but he was not certain if the sign was erected prior to 2005. More significantly, undisputed evidence regarding ODOT's maintenance of the roadway established that ODOT maintenance personnel had cleared the culvert of debris just hours before the accident. Moreover, all of the witnesses who had the opportunity to observe the conditions of the roadway at or near the time of the accident testified that the creek had swelled with rainwater and that the current was moving rapidly, but that the creek was not flowing over SR 41. Thus, the evidence at trial established that the creek had not breached the culvert on the date of the accident.

{¶ 14} Plaintiff argues, in the alternative, that had ODOT elected to correct the periodic high water problem on SR 41 by reconstructing the bridge, ODOT would have also been legally required, in connection with such a project, to erect a guardrail at the approach to the bridge. As will be discussed below, plaintiff contends that a guardrail would have either prevented the accident altogether or, at a minimum, deflected the Corolla away from the creek. However, having determined that ODOT's knowledge of the periodic high water problem did not give rise to a duty to reconstruct the roadway, plaintiff's legal argument lacks factual support. Consequently, if plaintiff is to recover from defendant on a negligence theory, there must be proof of ODOT's negligence with regard to a hazardous condition that existed off the paved portion of the roadway.

{¶ 15} In that regard, plaintiff contends that ODOT had a duty to erect a guardrail at the approach to the bridge at Ripley Pike Road and SR 41 in order to ensure that vehicles leaving the roadway would not plummet into the creek. Defendant argues that Ohio law does not impose such a duty upon ODOT under the circumstances of this case. The court agrees.

{¶ 16} "The existence of a duty is fundamental to establishing actionable negligence, without which there is no legal liability." *Adelman v. Timman* (1997), 117 Ohio App.3d 544, 549. Determination of whether a duty exists is a question of law for the court to decide. *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318. The standard of care required of ODOT in guardrail cases is "that of the current written standards in effect at the time of the planning, approval or construction of the site and that, absent such written standards, the standard is that of a reasonable engineer using accepted practices *at the time of construction.*" (Emphasis added.) *Longfellow v. Ohio Dept. of Transp.* (Dec. 24, 1992), Franklin App. No. 92AP-549.

{¶ 17} The evidence shows that the stretch of SR 41 in question, including the bridge and the culvert, was designed and constructed in 1939. The weight of the evidence also establishes that the roadway met all applicable design and safety standards in existence at that time. Safety and design standards have evolved considerably since 1939 as evidenced by ODOT's 1990 Location and Design Manual. In fact, the parties agree that had this particular bridge been constructed in 2005, ODOT's Location and Design Manual would have required the erection of a steel beam guardrail at the approach to Ripley Pike Road from southbound SR 41.

{¶ 18} Former ODOT District 9 Studies Engineer and current District 9 Planning Director, Gregory Baird, testified that he administers ODOT's bridge inspection program. Baird testified that, pursuant to ODOT's 2001 Bridge Inspection Manual, every Ohio bridge must be inspected at least once every year. Baird stated that inspectors grade bridges pursuant to current design and safety standards regardless of when they were built. In fact, the preprinted ODOT bridge inspection forms upon which ODOT inspectors report their findings contain a section for the inspector to provide a number grade for every item on ODOT's current inventory for the structure. Each of the completed bridge inspection reports admitted into evidence for the bridge at SR 41 and

Ripley Pike Road contains a space in which the inspector is to enter a number grade for "1 steel beam guardrail."

{¶ 19} Plaintiff claims that ODOT had a duty to install such a guardrail inasmuch as its own manual now requires such a safety device and because its own inspection policies suggest that there should be a guardrail at the site. However, it is well-settled that in the performance of road maintenance activities, ODOT has no duty to upgrade the roadway in order to meet current design and safety standards. *Rahman v. Ohio Dept. of Transp.,* Franklin App. No. 05AP-439, 2006-Ohio-3013; *Longfellow*, supra; *Lunar v. Ohio Dept. of Trans.* (1989), 61 Ohio App.3d 143, 147. Maintenance is said to entail only the preservation of existing highway facilities, not the initiation of substantial improvements. *Rahman*, supra, at ¶21 (reducing road width to permit better drainage is road "maintenance" not a substantial improvement).

{¶ 20} Plaintiff was unable to present any evidence that would permit the court to conclude that a substantial improvement had been made to the bridge or the roadway at any time prior to the 2005 accident. Absent such proof, the court must conclude that ODOT was under no legal obligation to install a guardrail at the site.

{¶ 21} Much of the evidence at trial concerned ODOT's decision to forego installation of a guardrail when the safety of the bridge was first questioned in 2000. On September 25, 2000, there were two fatalities at the intersection when a vehicle plunged into the creek at roughly the same location and under very similar circumstances to the accident that claimed the lives of Shane and Marlee Grace. Ultimately, a decision was made by certain ODOT personnel to forego installation of a guardrail at that time. Plaintiff argues that had ODOT exercised better judgment and erected the guardrail after the 2000 accident, Shane would still be alive today. Thus, plaintiff contends that ODOT's failure to erect the guardrail after the fatal crash of 2000 constitutes actionable negligence.

{¶ 22} In response, ODOT produced various traffic records and reports which showed that there were only four motor vehicle accidents at this particular intersection in the 13-year period immediately prior to 2005, which included the fatal accident of September 25, 2000. The same records showed that the September 25, 2000 accident resulted in the only fatalities in that 13-year period. Additionally, the records establish a

traffic count of up to 1,900 vehicles per day on this stretch of SR 41. Thus, the accident rate for this particular intersection was relatively low.

{¶ 23} State Highway Patrol Trooper, Richard Gable, was on his way to another call when he saw the Corolla floating upside down in the creek with its front end wedged in the culvert. Gable testified that the creek was cresting one to two inches below the top of the culvert and close to the top of its banks but that he had no difficulty seeing the solid white line at the edge of the roadway even though it was still raining. Gable did not consider the intersection to be a "high accident area" and he had knowledge of "only a few minor accidents" at the site.

{¶ 24} Plaintiff called Randy Walters, Village of Manchester Police Chief and local firefighter, to testify about the hazardous conditions he observed at the intersection of Ripley Pike Road and SR 41. Walters had been part of the road clean-up crew following the fatal accident on September 25, 2000, and he was one of the original responders to the 2005 crash. According to Walters, he called ODOT after the 2000 accident to complain about the flood waters that poured out over the culvert and onto the surface of SR 41 "five to ten times per year." During that conversation, Walters also suggested that a guardrail be installed. Walters testified that he could not recall whom he spoke with in 2000, but that he was sure that he received no return call. Walters called ODOT again after the 2005 accident because he felt "something needed to be done."

{¶ 25} Osman testified that he visited the intersection of Ripley Pike Road and SR 41 on the Monday following the fatal accident that occurred on September 25, 2000. His intention was to determine whether any maintenance issues existed at the site. Although Osman determined that maintenance was not a problem, he did contact Joseph Armstrong, an engineer who was employed by ODOT as District 9 Highway Maintenance Supervisor, to discuss the possibility of installing a guardrail at the approach to Ripley Pike Road from SR 41. At trial, Osman testified that he did not recall receiving any response from Armstrong. In his deposition, however, Osman stated that Armstrong informed him that the traffic count on SR 41 in the area of Ripley Pike Road did not justify immediate installation of a guardrail but that one would be installed in conjunction with any future roadway upgrade. Armstrong could not recall

having such a conversation with Osman in 2000. Vaughn Wilson, ODOT District 9 Highway Management Administrator, testified that he was unaware of the fatal crash that occurred at SR 41 and Ripley Pike Road on September 25, 2000, until he was told of the incident by Osman following the 2005 accident involving the Morgans.

{¶ 26} There is no dispute that, after the accident which claimed the lives of Shane and Marlee Grace in 2005, Wilson authorized the installment of a steel beam guardrail at the approach to SR 41 and Ripley Pike Road. According to Wilson, who is now retired from his post at ODOT District 9, he made the decision to erect the guardrail "in a very short time frame" following the 2005 accident. Osman had received numerous complaints about the safety of the intersection and many requests for the installation of a guardrail, which he had passed on to Wilson. Wilson testified that the primary reason he gave the "green light" to the upgrade was the public outcry for a guardrail that arose out of the deaths of Shane and Marlee Grace.

{¶ 27} Due to his perceived need for immediate action, Wilson subsequently elected to circumvent customary ODOT procedures whereby he arranged for a local contractor to install the guardrail. Wilson paid the costs of installation out of ODOT's "ding and dent fund." Although Osman admitted that the fund was generally earmarked for maintenance and repair work only, he admitted that, in the past, he had used the fund to pay for the costs of a new guardrail when he felt that one was needed. Wilson acknowledged that if he had employed proper channels in requesting a guardrail, it likely would have taken six months for the process to be completed and he was not convinced that the results of a required traffic study would have justified the immediate construction of a guardrail at the location.

{¶ 28} Armstrong did recall discussing the need for a guardrail at the site with Wilson and Osman shortly after the fatal crash of 2005. According to Armstrong, neither he nor Wilson had the authority to approve a highway upgrade, such as the installation of a new guardrail, without first consulting ODOT's deputy director. However, when he was questioned by counsel regarding Wilson's subsequent decision to approve the guardrail project without such consultation, he testified that he "thought it was o.k."

{¶ 29} Ultimately a "Guardrail Repair Work Order" was issued on June 17, 2005, in the total amount of $8,490. (Plaintiff's Exhibit 14H.) The last page of said repair order contains a "special note" stating "<u>critical </u>due to two fatalities @ Ripley Pike Rd." (Emphasis sic.) Plaintiff concedes that the installation of the guardrail after the 2005 accident does not constitute an admission of negligence on the part of ODOT. Indeed, the totality of the evidence fails to persuade the court that this particular stretch of SR 41 was unreasonably dangerous. Nevertheless, even if the court were to conclude, with the benefit of hindsight, that ODOT failed to exercise due care when it decided to forgo installation of a guardrail after the fatal accident that occurred in 2000, the doctrine of discretionary immunity shields ODOT from liability for that decision.

{¶ 30} "The language of R.C. 2743.02 that 'the state' shall 'have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *' means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." (Emphasis added.) *Reynolds v. State* (1984), 14 Ohio St.3d 68, 70. The doctrine of discretionary immunity "has been applied to immunize the state from liability for discretionary decisions such as whether or not to install a traffic signal at an intersection, [and] what type of traffic signal to install." (Citations omitted.) *Young v. Univ. of Akron*, Franklin App. No. 06AP-1022, 2007-Ohio-4663, ¶14.

{¶ 31} As stated above, following the fatal accident in 2000, ODOT gave some preliminary consideration to the installation of a guardrail at the site but decided to forgo installation until such time as the site was scheduled for an upgrade. Defendant's expert, Duane Ferguson, testified that the decision whether to install a guardrail at a particular site is a matter of engineering judgment inasmuch as an improperly positioned or installed guardrail can be a roadside hazard in and of itself. Even plaintiff's own expert, Lester Auble, P.E., admitted that the decision to install a guardrail around a particular roadside hazard requires a determination whether the risk of harm arising

from vehicles striking the guardrail is less than the risk of harm arising from vehicles contacting the hazard.

{¶ 32} The court finds that such a decision was clearly an exercise of an executive or planning function that involved the making of a basic policy decision which was characterized by the exercise of a high degree of official judgment or discretion. Consequently, ODOT cannot be held liable to plaintiff for any harm arising from such exercise of its decision-making authority.

{¶ 33} Defendant argues, in the alternative, that even if it had erected a guardrail as plaintiff suggests, the speed of the Corolla as it left the roadway near Ripley Pike Road was so excessive in light of the road conditions that a guardrail would not have prevented the vehicle from entering the creek. Defendant's expert opined that the Corolla was traveling at 70 miles per hour (mph) when it left the roadway and that, at such a speed, the Corolla would have traveled over the guardrail and still landed in the creek. The parties agree that the posted speed limit for this particular stretch of SR 41 is 55 mph. Conversely, plaintiff contends that the vehicle was traveling at only 45 mph when it left the paved portion of the roadway and only 19 mph when it reached the grassy area between the roadway and the creek. According to plaintiff's expert, the presence of a properly installed guardrail would have prevented the Corolla from reaching the creek.

{¶ 34} The court received a sufficient quantity of evidence which, if believed, would have supported either of the conflicting expert opinions regarding the speed of the Corolla. However, having determined that ODOT had no duty to erect a guardrail or to otherwise reconstruct the site prior to the fatal accident, and having further determined that ODOT was immune from liability for its decision to forgo the installation of a guardrail in 2000, a specific determination of vehicle speed is unnecessary. Similarly, the court need not address defendant's contention that, had it breached a duty to Shane, his own contributory negligence barred recovery inasmuch as such negligence was greater than defendant's negligence. See R.C. 2315.33. Indeed, having determined that defendant did not owe a duty to plaintiff's decedent either to redesign the roadway in order to correct the periodic high water problem or to install a

guardrail to prevent his vehicle from reaching the creek once it left the roadway, the issues of contributory and comparative negligence do not arise.

{¶ 35} As an alternative theory of liability, plaintiff alleges that, at the time of the accident, the intersection of SR 41 and Ripley Pike Road was a qualified nuisance and that ODOT breached a duty it owed to plaintiff when it failed to abate the nuisance.  A qualified nuisance is "anything lawfully but so negligently or carelessly done or permitted as to create a potential and unreasonable risk of harm which, in due course, results in injury to another."  *Taylor v. Cincinnati* (1944), 143 Ohio St. 426, at 445.  "[A] civil action based upon the maintenance of a qualified nuisance is essentially an action in tort for the negligent maintenance of a condition, which, of itself, creates an unreasonable risk of harm, ultimately resulting in injury.  The dangerous condition constitutes the nuisance.  The action for damages is predicated upon carelessly or negligently allowing such condition to exist."  *Rothfuss v. Hamilton Masonic Temple Co.* (1973), 34 Ohio St.2d 176, 180.  Under a claim of qualified nuisance, the allegations of nuisance and negligence merge to become a negligence action.  *Allen Freight Lines, Inc. v. Consol. Rail Corp.* (1992), 64 Ohio St.3d 274.

{¶ 36} Given the court's findings of fact and conclusions of law regarding ODOT's liability to plaintiff under a negligence theory, any further discussion of the liability issue in the context of qualified nuisance is unnecessary.

{¶ 37} For the foregoing reasons, the court finds that plaintiff has failed to prove negligence by the preponderance of the evidence and, accordingly, judgment shall be rendered in favor of ODOT.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

THE ESTATE OF SHANE MORGAN

Plaintiff

v.

OHIO DEPARTMENT OF TRANSPORTATION

    Defendant
    Case No. 2006-03991

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

David E. Grimes
231 North Cross Street
West Union, Ohio 45693

Peter E. DeMarco
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

LP/cmd
Filed March 22, 2010
To S.C. reporter April 5, 2010